294 F.2d 785
 In the Matter of the WOODMAR REALTY COMPANY, a Corporation,
Debtor, WOODMAR REALTY COMPANY, a Corporation, Appellant,
v.
Walter A. McLEAN, Trustee and Herschel B. Davis, Trustee's
Attorney,Appellees.
 No. 13215.
 United States Court of Appeals Seventh Circuit.
 June 23, 1961, As Amended on Denial of Rehearing Oct. 2, 1961.
 
 1
 Benjamin Wham, Chicago, Ill., Owen W. Crumpacker, Hammond, Ind., for appellant.
 
 
 2
 Gilbert Gruenberg, Gary, Ind., for appellees.
 
 
 3
 Before KNOCH and CASTLE, Circuit Judges, and MERCER, District Judge.
 
 
 4
 MERCER, District Judge.
 
 
 5
 The only issue before us for decision upon this appeal by the bankrupt, Woodmar Realty Company, is whether the court below properly dismissed Woodmar's amended petition for the removal of the appellees, Walter A. McLean and Herschel B. Davis, as trustee in bankruptcy and attorney for the trustee, respectively. For convenience, the parties are hereinafter sometimes referred to as appellant and appellees.
 
 
 6
 Appellant's amended petition, filed January 7, 1959, charged that appellees had perpetrated, and were perpetrating, a fraud upon the court and Woodmar and requested that appellees be removed by the court as trustee in bankruptcy and as counsel, respectively. Appellees moved to dismiss. After a hearing, the court granted that motion upon its conclusion that 'the amended petition is so wanting in merit and so contemptuously violative of the rules of pleading, particularly Rules 8 and 9 of the Federal Rules of Civil Procedure' that it might be summarily dismissed and upon his finding that the amended petition was not filed in good faith.
 
 
 7
 We have reviewed the record and the amended petition carefully and are convinced that the petition is so wanting in sufficient allegations of fact as to present not even token compliance with the provisions of Rule 9(b) which require a pleader averring fraud to state 'with particularity' the circumstances alleged to constitute fraud. F.R.C.P. 9(b), 28 U.S.C.A. This opinion might rest there and the judgment be affirmed without further discussion, were it not for the pervading impression gathered from this record that the removal petition constitutes an attempt by appellant's attorney, Mr. Crumpacker, to harass appellees in the continued performance of their official functions and a near-contemptuous abuse of the processes of a federal court.
 
 
 8
 For the above reason we think it necessary to analyze the amended petition at some length in the light of the record as it has come to our knowledge. In that endeavor, we rely upon the procedural history of this case as summarized in the opinions upon prior appeals. In re Woodmar Realty Co., 7 Cir., 284 F.2d 815; In re Woodmar Realty Co., 7 Cir., 241 F.2d 768, 64 A.L.R.2d 883. Basically, we hereinafter supplement those summaries, but we have not hesitated to resort to repetition thereof to the extent deemed necessary to demonstrate the propriety of our conclusions which are hereinabove and hereinafter expressed.
 
 
 9
 The inception of this cause lies in the depression which struck the nation with tornadic force in 1929. In the 1920's, appellant, a corporation, was engaged in the business of subdividing and selling real estate in the City of Hammond, Indiana. Substantial improvements touching the various parcels of appellant's lands were made by the City of Hammond and financed by special assessment bonds issued and sold pursuant to the so-called Barrett Law.
 
 
 10
 By separate lot and parcel, appellant's real estate was impressed with the liens of Barrett Bonds issued on some sixty separate bond rolls. In each instance, appellant in consideration of the privilege of paying the assessment obligation in installments spread over a period of years, executed a statutory waiver of the right to question the legality of assessment and agreement to pay installments as the same became due.
 
 
 11
 It appears that appellant had been a completely inactive corporation for many years prior to January, 1941, when this cause was commenced. No payments had been made by it on account of the principal and interest of Barrett bond obligations after 1929. Suits had then been commenced in state courts for the foreclosure of Barrett bonds issued upon some fifty rolls affecting appellant's real estate and, as the court below has found, sale of much of the land in foreclosure was imminent.
 
 
 12
 Against that background, this proceeding was commenced on January 13, 1941, when an involuntary petition was filed on behalf of three bondholders for reorganization of appellant under Chapter X of the Bankruptcy Act. 11 U.S.C.A. 501 et seq. Appellant's only assets were substantial real estate located in Hammond, which was then encumbered by a lien for state taxes in the sum of $161,000.00, by the lien of mortgage bonds in an aggregate sum in excess of $290,000.00, and by the defaulted Barrett bonds which were, respectively, liens upon separate lots, tracts and parcels of the total real estate holdings. In addition, appellant was then indebted to general creditors in the aggregate sum of approximately $14,000.00.
 
 
 13
 A proposed plan of reorganization was approved by Judge Slick. Barrett bond claims were classified as class 2 claims. With court approval, the tax claim and mortgage claims were compromised and settled for a nominal percentage of the respective amounts thereof. Appellant's real estate was sold free of all liens under court orders providing that all liens would attach to the proceeds of the sales in the hands of the trustee. Such sales continued until early 1951, and were approved by the court upon some fifty separate petitions reporting sales as they were made from time to time.
 
 
 14
 Also, when the reorganization petition was approved on January 25, 1941, an injunction was issued by the court enjoining creditors and all other persons from enforcing liens against appellant's property, and from prosecuting, or continuing the prosecution of, any suit against appellant in any court for the foreclosure of liens against its property. Pursuant to that injunction, the pending foreclosure suits were dismissed insofar as they related to appellant's real estate.
 
 
 15
 On December 22, 1952, appellee McLean was appointed successor trustee as a result of circumstances hereinafter related and appellee Davis was retained as attorney for the trustee. Thereafter, on February 16, 1953, after notice and a hearing, Judge Swygert entered an order converting the proceedings into a straight bankruptcy, and ordered that bankruptcy be proceeded with pursuant to Section 236(2) of the Bankruptcy Act. 11 U.S.C.A. 636(2).
 
 
 16
 On September 7, 1955, appellee McLean filed his final report as trustee and petitions recommending the allowance of more than 300 class 2 lien claims. By that report, he proposed that substantially all of the funds in his hands be allocated to the payment of those claims. Thereafter, appellant and some of its stockholders filed objections to a substantial number of the class 2 claims. On March 5, 1956, after a hearing upon motions filed by the trustee and a number of the class 2 claimants, Judge Swygert entered an order striking appellant's objections. An appeal was taken and we reversed that judgment, holding that appellant, though adjudicated a bankrupt, had standing to object to claims because of the circumstance that disallowance of class 2 claims might result in a surplus of assets for refund to appellant. In re Woodmar Realty Co., 7 Cir., 241 F.2d 768, 64 A.L.R.2d 883.
 
 
 17
 Before our mandate was filed, Judge Swygert disqualified himself to preside further in the cause because of circumstances which are hereinafter related and the cause was assigned to Judge Parkinson.
 
 
 18
 Upon the return of our mandate, Judge Parkinson scheduled a pre-trial conference upon all claims and objections thereto. On the day preceding that conference, June 27, 1957, appellant filed a petition for removal of appellees as trustee and as counsel for the trustee. At the pre-trial conference on June 28, Judge Parkinson determined that he would schedule a trial of a representative claim to establish the law of the case with respect to all of appellant's objections. Claim No. 441 was selected for that purpose. At the same time, an order, which we believe to be patently erroneous, was entered directing the trustee and his attorney not to participate in the trial of objections to that claim.[1] Other class 2 claimants were, however, invited to participate. On the same date, a hearing upon appellant's petition for removal of appellees was set for July 17, 1957.
 
 
 19
 A trial of objections upon claim 441 was held on July 15, 1957, and briefs were ordered. On July 17, the date set for a hearing upon the removal petition, that petition was withdrawn by appellant.
 
 
 20
 Thereafter, while the issues presented upon the trial of objections were still under advisement, Judge Parkinson was elevated to this court and the case was assigned to his successor, Judge Grant. Judge Grant disqualified himself for personal reasons, and the case was reassigned by Judge Duffy, then Chief Judge of the Seventh Circuit, to Judge Tehan. By stipulation of interested parties, the issues upon the trial of objections were taken by Judge Tehan for decision upon the record made before Judge Parkinson.
 
 
 21
 In the meantime, on May 19, 1958, counsel for appellant filed a petition for removal of appellees which was almost an exact duplicate of the petition which had been withdrawn by him on July 17, 1957. The petition was answered and set for a hearing. On the date set for that hearing, Judge Tehan, on his own motion, ordered appellant to replead to comply with the requirements of Rule 9(b). Appellant's amended petition was then filed on January 7, 1959.
 
 
 22
 The amended petition is characterized by a gross lack of any sufficient allegation of fraud as we have hereinabove concluded. In fact, counsel can give arguable credence to this appeal and arguable merit to the amended petition only by asserting supposed legal principles which are so grossly absurd that we cannot believe they are here honestly asserted. In the interest of smooth rhetorical transition all of such contentions are not here particularized, but they are subsequently discussed briefly in proper context.
 
 
 23
 Counsel first contends that we must pretend that the record facts laboriously compiled in the records and files of the court below in more than twenty years of proceedings do not exist and that we may not on this appeal take judicial notice of such facts. It is elementary that the court below was duty bound to take judicial notice of its records and files in this cause and that it is our duty to take notice of facts which have come to our knowledge through the records presented to us on the several appeals in this same case. Paridy v. Caterpillar Tractor Co., 7 Cir., 48 F.2d 166, 168; Littleton v. Delashmutt, 4 Cir., 188 F.2d 973; Fletcher v. Bryan, 4 Cir., 175 F.2d 716; In re Davis Mfg. Co., D.C.D.Kan., 95 F.Supp. 200, 203. However absurd the above contention, it is yet only the minor premise employed to support a hypothesis that appellee's motion to dismiss appellant's amended petition must be construed as admitting all facts alleged, even though such alleged facts are shown by the record of the case to be untrue. That hypothesis is too tenuous to require any comment. See E.g., Interstate Natural Gas Co. v. Southern California Gas Co., 9 Cir., 209 F.2d 380, 384; Fletcher v. Jones, 70 App.D.C. 179, 105 F.2d 58, 61. Since we must take judicial notice of the fact, whenever it be the fact, that the allegations of appellant's amended petition are refuted by the record, we accordingly determine the sufficiency of the allegations of the amended petition in the light of the record of the case as it is known to us.
 
 
 24
 Both the original petition and the amended petition are summarized in some detail in Judge Tehan's opinion filed October 21, 1960. We adopt that summary as our own, and here employ only such narrative description of the charges of the amended petition as is consistent with an intelligible discussion of the allegations thereof in the light of the record.
 
 
 25
 If the amended petition has any factual basis whatsoever, it tends to state a charge not against appellees, but only a renewal of charges made at least as early as November, 1952, against the prior trustee, Charles L. Suprise, and other persons. Thus it is alleged that Suprise, and others, conspired to perpetrate a fraud upon the court and appellant in order to obtain the initial finding of appellant's insolvency, to have themselves appointed as fiduciaries having control of appellant's property and thereafter to dispose of and distributed appellant's property to class 2 claimants to their own benefit and profit.
 
 
 26
 The amended petition contains not a single allegation connecting either of the appellees with the alleged conspiracy and fraudulent conduct of those persons, except for the record fact that appellee Davis was appointed by the court as cocounsel for Suprise in May, 1950, and served Suprise in that capacity until hearings were commenced in 1951, which ultimately led to the removal of Suprise as trustee. Upon that record fact hangs the tenuous allegation that Mr. Davis became tainted by the alleged fraud of Suprise through that representation and that appellee McLean became likewise tainted through his association with Mr. Davis after Mr. McLean was appointed successor trustee.
 
 
 27
 In his opinion dismissing the amended petition, Judge Tehan correctly and accurately concluded that such allegations were an 'obvious attempt to establish guilt by association', and that the allegations were refuted by facts found and adjudicated in this case. We approve those conclusions without reservation, and resort to the resume of the procedural history of the case which follows only because we think it necessary to document the evident fact of gross bad faith which characterizes these allegations.
 
 
 28
 When Judge Slick granted the involuntary petition for reorganization of appellant, Suprise was appointed trustee in the reorganization and Carl A. Huebner was appointed as attorney for the trustee. Thereafter, a plan of reorganization was approved by the court and a bondholders committee consisting of owners of special improvement bonds and attorneys for such owners was appointed.
 
 
 29
 The record made during the first ten years of this proceeding discloses no participation by appellant in the cause after January 25, 1941, when the involuntary petition for reorganization was approved. Appellant's participation on the latter date consisted of the filing of an answer, in which all allegations of the reorganization petition were admitted, including the allegation of appellant's insolvency. During that ten year period, as previously related, the foreclosure suits affecting appellant's property were dismissed pursuant to the injunction issued by Judge Slick, the tax liens and mortgage liens were compromised and settled and appellant's real estate was sold with court approval, free of the liens of the Barrett Law bonds. The record discloses no objection by appellants at any stage of those proceedings, including the real estate sales.
 
 
 30
 In the meantime, in 1950, Carl Huebner was convicted in an Indiana court of criminal conduct in conjunction with the foreclosure of Barrett Law bonds. Judge Swygert, who was then presiding in the case, effected Huebner's removal as attorney for Suprise and on May 23, 1950, appointed the appellee and Arnold Huebner, Carl's brother, as co-counsel for the trustee.
 
 
 31
 An amendment to the plan of reorganization was filed in the early part of 1951, and set for hearing at a meeting of interested persons to be held on April 16, 1951. Also pending at that time were petitions filed by Suprise, Carl Huebner, Arnold Huebner, Mr. Davis, members of the bondholders committee and attorneys for the bondholders committee for the allowance of fees.
 
 
 32
 On the latter date, appellant filed a petition for the removal of Suprise as trustee, alleging that neither he nor the Huebners were disinterested persons for the reason that Suprise and Carl Huebner were principal owners of Lake Assessment Bonds Service, Inc., a holder and collection agent for a number of the special improvement bonds which were a lien upon appellant's real estate. It was also alleged that S. C. Ennis & Company, selected by Suprise as agent for sale of the real estate, had sold a large part of appellant's real estate to a corporation owned by itself.
 
 
 33
 At the same time, appellant filed objections to the fee petitions of Suprise and both Huebners upon the ground that each owned, or represented, interests which were adverse to those of both the creditors and stockholders of appellant. Objection was made to the fee petitions of members of the bondholders committee and their attorneys upon the ground that they had employed their positions to effect the purchase of outstanding bonds which were a lien upon appellant's real estate during their tenure as court-appointed fiduciaries.
 
 
 34
 Appellant's objection to Mr. Davis' petition for fees was predicated upon the alleged fact that Mr. Davis had represented a disqualified trustee and had, in that representation, worked in collaboration with a disqualified co-counsel, Arnold Huebner, and a disqualified bondholders committee. It was also alleged that Mr. Davis had been remiss in his failure to discover and report to the court the activities and conflicting relationships of Suprise and other fiduciaries.
 
 
 35
 One other petition by appellant, namely a petition requesting the court to find that appellant was not insolvent, was before the court with the petition for removal of Suprise and appellant's objections to the fee petitions.
 
 
 36
 After extensive hearings had been held in 1951 and 1952, Judge Swygert entered a memorandum order on October 29, 1952, disposing of the above pending petitions and objections. The court found that Suprise and Carl Huebner, as substantial owners of Lake Assessment, held an interest which was materially adverse to the creditors and stockholders of appellant, and concluded that those persons would not have been appointed as trustee and trustee's attorney had that adverse interest been known to the court. The court found, further, that certain sales of real estate by Ennis had not been made at arm's length and that several of the persons acting in a fiduciary capacity in the estate had used their appointment to profit from speculation in Barrett bonds which were liens upon appellant's property. The court concluded, however, that no prejudice to creditors or the stockholders of appellant was revealed by the evidence.[2]
 
 
 37
 An order was then entered removing Suprise as trustee, disbanding the bondholders committee, denying the fee petitions of Suprise, the Huebners and certain other of the fiduciaries and directing that statutory notice be given of a hearing to convert the cause to a straight bankruptcy pursuant to Section 236(2).
 
 
 38
 The fee petition of Mr. Davis and those of certain of the members of the bondholders committee were allowed. In allowing the Davis fee petition, the court found that there was no evidence that Mr. Davis had knowledge of the improper interest and conduct of Suprise and the other fiduciaries or that appellant's attorney had ever called those facts to his attention prior to the hearing upon the petition to remove Suprise.
 
 
 39
 Finally, by the same opinion, Judge Swygert rejected appellant's petition for a decree of its solvency, holding that appellant was bound by the admission of insolvency made in its answer filed in 1941.
 
 
 40
 On November 7, 1952, appellant and some of its stockholders filed a motion for a new trial and for amendment of the findings of fact entered October 29, 1952, alleging, in part, as follows: a. That the court had erred in allowing compensation to certain members of the bondholders committee in view of the alleged proof that they had conspired with Suprise and his attorneys to perpetrate a fraud upon the court and upon appellant; and b. That the court had erred in failing to find that the original reorganization petition had been a part of a conspiracy to perpetrate a fraud upon the court and appellant to obtain a decree of insolvency and to gain control of appellant's assets.
 
 
 41
 No error was alleged with respect to the allowance of fees to Mr. Davis. That motion was denied on February 10, 1953, and no appeal was taken.
 
 
 42
 In the meantime, on December 3, 1952, one Samuel H. Cohn was appointed successor trustee. Mr. Cohn died within two weeks thereafter and the appellee, McLean, was appointed successor trustee on December 22, 1952. Appellee, Davis, was retained by the court as attorney for the trustee.
 
 
 43
 On February 16, 1953, after notice and a hearing, appellant was adjudicated a bankrupt. From the findings of the court entered at that time, it appears that counsel for appellant consented to that adjudication.
 
 
 44
 Pursuant to authority granted by the court, appellees employed auditors to audit the records of Barrett bonds affecting appellant's property as shown by the books and records of the Treasurer of the City of Hammond. An audit was made, and on the basis thereof appellee McLean filed his final report and petition for allowance of certain class 2 claims on September 7, 1955. By that report he proposed that claims upon special assessment bonds be allowed, and that funds be allocated therefor as follows: a. The sum of $382,989.63 to 310 claims on which the bonds had been produced and checked; b. The sum of $17,705.48 to 43 claims on which the bonds had not been produced and checked; and, c. The sum of $43,436.47 to remaining outstanding bonds and coupons upon the fifty assessment rolls upon which no claims had been filed. It was proposed that the latter two aggregate sums be paid to the Clerk of the Court for the use of bondholders ultimately entitled thereto.
 
 
 45
 At this point in the case, appellant and some of its stockholders filed their objections to class 2 claims, which led to the order of March 5, 1956, and the first appeal as hereinabove related. In re Woodmar Realty Co., 7 Cir., 241 F.2d 768.
 
 
 46
 On March 20, 1956, appellant filed a motion to vacate the order of November 22, 1941, and the findings of fact and conclusions of law entered October 29, 1952, insofar as it was there adjudicated that appellant was insolvent. That motion alleged that such orders had been procured by fraud; that appellees had been and were suppressing defenses and objections to class 2 claims; and that the motion was timely 'because this is the first time that Woodmar and its stockholders have been prejudiced by' the orders of November 22, 1941, and October 29, 1952.
 
 
 47
 The latter motion was stricken on March 20, 1956, and though the appeal was taken from the order of March 5, 1956, it appears from our opinion in In re Woodmar Realty Company, 7 Cir., 241 F.2d 768, 64 A.L.R.2d 883, that the March 20th order striking appellant's motion to vacate the 1941 order and the 1952 findings and conclusions was not then presented to this Court for review.
 
 
 48
 The history of events following the issuance of our mandate in the first appeal as hereinabove related, i.e., the selection of claim 441 for trial and the filing and withdrawal of the 1957 removal petition follow in sequence at this point and are pertinent. Finally, the amended petition under review followed.
 
 
 49
 From the foregoing summary of some pertinent parts of the record facts in this cause emerges a pattern of conduct which has characterized the actions of counsel for appellant in this case for some ten years. Whatever may be said of the conduct of Suprise, Huebner and others prior to the hearings in 1951 and 1952, an able trial judge rectified the situation by the 1952 opinion and order. Though appellant expressly requested the court to find that this case had its inception in fraud and that a fraud had been perpetrated upon the court by Suprise and others, no finding of fraud was entered. On the contrary, the court expressed the opinion that the evidence failed to show that any prejudice resulted from the misconduct then disclosed. The record indicates that appellant and its counsel were then in accord with that conclusion, inasmuch as no appeal was taken from the 1952 decision, and thereafter, appellant, through its counsel, consented to the adjudication of appellant's bankruptcy and to continuation of the cause in bankruptcy pursuant to Section 236(2).
 
 
 50
 Notwithstanding that apparent accord, counsel has advanced the same charges of fraud in 1956 and 1957. Thereafter, on May 19, 1958, counsel for appellant stated in a pre-trial conference that there were no prior orders of court which he felt should be vacated because of elements of fraud alleged to affect the cause. Contemporaneously with that statement, the fraud charges were renewed by the 1958 petition which, as amended in 1959, is now before the court for review.
 
 
 51
 If nothing were here involved except the time element, there is a limit to the period of years over which the same dead horse may be beaten. The Suprise era of this case became final when no appeal was taken from the orders entered in 1952 and 1953 rejecting the contention that the adjudication of insolvency was obtained through fraud. The same contention was advanced and rejected in 1956, and no appeal was taken.
 
 
 52
 There is, however, more involved here than the time element, namely, a vituperous tendency of counsel to read some heinous motive into the acts of anyone who dares to oppose him and of every judge who rules adversely to him. The record certainly supports the inference drawn in appellee's brief that the 1957 petition, which was withdrawn, was a warning to appellees to not interfere in the plans of appellant's counsel, and that the 1958 petition followed when that warning was not heeded. In that respect, we note that the 1957 petition was filed on the eve of the commencement of litigation upon appellant's objections to class 2 claims, that it was withdrawn shortly after the order of court which neutralized the trustee and his counsel insofar as the trial of the test case was concerned and within two days after the trial of the test case had been completed and that the 1958 petition was filed a mere matter of days prior to appellant's filing of settlement agreements which were the subject of the second appeal. In re Woodmar Realty Co., 7 Cir., 284 F.2d 815. We think that fact of timing is significant, and it is certainly consistent with the pattern which the record reveals of charging both the dead and the living with fraud whenever an adverse ruling is contemplated or becomes a reality.
 
 
 53
 Although formal charges are confined to the trustee and his counsel, appellant's brief reveals that the trial judges are not immune from similar attack. We abhor the insinuations that every trial judge, except the late Judge Parkinson, who has been burdened by this case since 1951, is either a blundering idiot, or, impliedly, a tool of some heinous scheme. Those insinuations cannot be justified by anything which appears of record. Moreover, they are apparently motivated by the same lack of honesty which is apparent in the circumstances surrounding Judge Swygert's order disqualifying himself.[3]
 
 
 54
 Before leaving this phase of the case, we remark the ridiculous assertion that the fact that appellees propose to distribute substantial sums to class 2 claimants reveals a purpose to carry out a scheme devised by Suprise who proposed a similar distribution of assets in 1951. More must be said of this later, but the fact remains that Mr. McLean, as trustee, represents the creditors of appellant and his recommendations, though yet neither rejected nor approved by the court below, appear on the surface to be a conscientious effort to recommend the allowance of claims which he believes to be valid.
 
 
 55
 The guilt by association allegations are followed by general allegations that appellees did not file objections to all of the class 2 claims, that they sought to suppress defenses to those claims by filing the trustee's final report in 1955 proposing the distribution of a substantial part of the funds in the hands of the trustee in satisfaction thereof and that appellees sought to prevent appellant from protecting the estate against those lien claims by moving to strike appellant's objections thereto. It is contended that each of those allegations supports appellant's conclusions that appellees are continuing a fraudulent scheme which began with Suprise, et al.
 
 
 56
 At the outset we reject the frivolous assertion of supposed legal principle that it is the duty of a trustee in bankruptcy to object to every claim filed against the estate which he represents. The Act enjoines a trustee in bankruptcy to examine all claims and 'object to the allowance of such claims as may be improper.' 11 U.S.C.A. 75, sub. a(8). Actually, counsel apparently concedes that the duty to object, generally, attaches only with respect to claims which the trustee deems invalid, but he argues that objections must be made here because the claims are based upon liens of special improvement bonds which are said to be the obligations of the City of Hammond, not of appellant.
 
 
 57
 That asserted exception is a complete misconception in at least two respects. The obligation of these bonds became the personal obligations of appellant upon its execution of the installment-payment waiver and agreement. Feder v. Gary State Bank, 98 Ind.App. 513, 186 N.E. 379; Central Bldg. & Loan Ass'n v. Gary State Bank, Ind.App., 186 N.E. 382; Larimer v. Gary State Bank, Ind.App., 186 N.E. 384; La Plante v. Englehart's Estate, Ind.App.,186 N.E. 385. Of greater significance, a trustee in bankruptcy represents every class of creditors of the bankrupt. He takes the same property rights which the bankrupt owned and he is charged with a duty to discover and honor recorded liens upon the property in his hands, In re Wakey, 7 Cir., 50 F.2d 869, 75 A.L.R. 1521; New York-Brooklyn Fuel Corp. v. Fuller, 2 Cir., 11 F.2d 802, and he may be held personally liable for his negligence if he disposes of property in his hands without discovering the record fact of the existence of a valid lien upon that property. In re Prather, D.C.S.D.Ill., 138 F.Supp. 433; Grodsky v. Sipe, D.C.E.D.Ill., 36 F.Supp. 244. Filing of objections without legal basis therefor is never required.
 
 
 58
 The general allegation, actually an insinuation, that appellees did not file objections to class 2 claims is simply partly untrue in the light of record facts. Of the some 340 claims filed in the reorganization and the some 202 claims filed in bankruptcy after February, 1953, appellees obtained the disallowance of 142 class 2 claims as barred by the statute of limitations, or as duplicated claims, and the partial disallowance of 24 additional claims filed by former fiduciaries. Appellees recommended the allowance of the balance of the class 2 claims upon their reported determination that each was a valid and subsisting lien upon the funds in the hands of the trustee and not subject to any legal defense. We express no opinion as to the merit of the trustee's final report from which the latter recitals of fact are taken since that report has not been acted upon by the court below. Appellant, however, does not contradict the recited fact that a number of class 2 claims were resisted and disallowed, and the report stands of record as a refutation of the allegation that appellees objected to no class 2 claims.
 
 
 59
 What is said above applies with equal force to the general allegations that appellees sought to suppress defenses to class 2 claims by recommending their allowance and by resisting appellant's efforts to object to such claims. The trustee's final report, which is yet pending, recites appellee's determination that no valid defenses could be made to the lien claims which he recommended for payment. The lower court's indicated decision of the test case upon claim 441, which is now of record, suggests that Judge Tehan agrees with appellees that the objections to those claims which appellant asserts are without merit. We express no opinion upon that point, since that decision is not before us on review. We note the indicated decision only for its tendency to illustrate the gross absurdity of the contention that the machinations of some nefarious plot led to the trustee's recommendation that certain of the class 2 claims be allowed.
 
 
 60
 The attempt to inject some sinister connotation into appellee's attempts to foreclose appellant's claim of right to object to the improvement bond claims, is ridiculously frivolous. Judge Swygert sustained the motions by appellee, McLean, and others to strike appellant's objections, and Judge Finnegan, of this court, dissented from our decision reversing the judgment striking appellant's objections. The point is, if some sinister connotation must be attached to appellee's act in preparing and filing the trustee's motion to strike, the 'sinister' view which prompted that act was shared by two very able jurists who believed that the trustee's motion to strike was well founded in law.
 
 
 61
 Further specific analysis of statements contained in the removal petition could serve no purpose. We find nothing of substance in any factual averment, but a wealth of conclusionary statements which lead invariably to counsel's vitriolic conclusions that appellees, who dare to oppose him, are guilty of heinous misdeeds.
 
 
 62
 We do note that counsel's statement that the 1958 petition and the amended petition were filed at the suggestion and direction of Judge Tehan is shown of record to be untrue. We approve the concluding paragraph of Judge Tehan's opinion, as follows, as a summary of the record in that respect:
 
 
 63
 'My own personal experience convinces me that there exists a complete lack of good faith. I was appointed in this case in late December, 1957, and held a few days of pre-trials in January, 1958. At that time and subsequently, petitioner's counsel repeatedly and persistently made charges of fraud against practically all persons who were in any sense adverse to him. I cautioned him and then finally admonished him that I would no longer tolerate these unlawyerlike, abusive charges against fellow attorneys, who were the objects of his charges. In so doing I did advert to the elementary fact that there was a method and remedy, if he had a proper claim. It was only then, some ten months after he had withdrawn his charges that he refiled them. This period, from July of 1957 to May 19, 1958, is certainly a substantial period for a person professing to believe that a fraud is being perpetrated upon the court and his client, to withhold action. His assertion of these grave charges, withdrawal of it, reinstatement of it have more the aroma of a pressure tactic than a sincere and righteous concern.'
 
 
 64
 Because we are convinced that the record in this case presents a contemptible, if not contemptuous, abuse of the legal processes of a federal court, we have dwelt at length upon a historical resume of the record facts as they have come to our attention. We did that advisedly in order that there may be no mistake that we are cognizant of the nature and severity of the question with which we deal. We find a sordid picture of the repeated use of ill-founded charges of fraud as a trial tactic which is foreign to established concepts of honest and ethical advocacy. We want it clearly understood that repetition of that practice as disclosed by this record will not be tolerated in the future.
 
 
 65
 Appellee's motion to file a supplemental brief was taken under advisement upon oral argument of this appeal. That motion is granted and the Clerk is directed to file the supplemental brief which was tendered to the court with that motion.
 
 
 66
 The judgment is affirmed.
 
 
 
 [1]
 That order was not appealed, and the propriety thereof was not an issue in the second appeal in which we approved settlement agreements disposing of a number of the pending class 2 claims. However, in his dissenting opinion, Judge Duffy did indicate his disapproval of the order. In re Woodmar Realty Co., 7 Cir., 284 F.2d 815, 821, 822
 
 
 [2]
 The methods and practices employed by Huebner and others who were connected with the early proceedings in this case in State court litigation involving Barrett bonds are documented in part in the following cases. In re Huebner, 233 Ind. 363, 118 N.E.2d 898; In re Harrison, 231 Ind. 665, 109 N.E.2d 722; Harrison v. State, 231 Ind. 147, 106 N.E.2d 912, 32 A.L.R.2d 875; Gardner v. State, 229 Ind. 368, 97 N.E.2d 921; Gilkison v. Darlington, 123 Ind.App. 28, 106 N.E.2d 473. From those cases it appears that fraud did affect the foreclosure proceedings upon some rolls of bonds issued under the Barrett Law
 In this case, it is a documented fact that extensive hearings were held relative to the activities of Suprise, Huebner and others, after which the court determined that their actions had been in some respects improper, but that those actions had not detrimentally affected appellant's estate and the administration thereof. It is apparent from Judge Swygert's opinion entered October 29, 1952, that he was convinced that no fraud had entered into the early stages of proceedings in this case. Since no appeal was taken from the order entered following that opinion it reasonably appears that appellant's counsel was also convinced that the proceedings had not been affected by fraud.
 
 
 [3]
 Prior to his appointment to the District Court, Judge Swygert was a member of a law firm which had filed a class suit to forever close Barrett bonds upon one roll which included bonds which were a lien upon a part of appellant's real estate. He apprised all parties to this case of that fact shortly after the case was assigned to him, and he was then assured by Mr. Crumpacker, as attorney for appellant, that that fact constituted no reason for his disqualification. Notwithstanding that assurance, that fact was alleged by Mr. Crumpacker as the predicative basis for a motion asking Judge Swygert to disqualify himself, which motion was filed some five years later and shortly following the entry of the order of March 5, 1956, striking appellant's objections to class 2 claims. Although Judge Swygert denied that motion, he did, as related in the text of this opinion, thereafter disqualify himself upon his own motion and assign the case to Judge Parkinson