OPINION OF THE COURT
Edward J. Greenfield, J.
This case had its genesis back in the heyday of tax shelters, when tax benefits could readily be transferred, bought and sold from one corporation to another. It involves such an attempt to transfer tax benefits for the mutual benefit of two major multinational corporations, a transaction which involved hundreds of millions of dollars, but which ultimately came to naught. The court, in this case, has been called upon to construe the meaning and application of a 1986 "leveraged lease” transaction between IBM Credit Financing Corp. (hereinafter IBM) and the Japanese automobile manufacturer, Mazda Motor Manufacturing Corp.[1]
The enactment of the Tax Reform Act of 1986, which also provided for a newly enacted alternative minimum tax (AMT), substantially impacted on the anticipated benefits of the proposed transaction, and despite the efforts of battalions of skilled lawyers who drafted multiple massive agreements attempting to deal with all contingencies, each party disputed how the agreement was to be interpreted in light of the tax changes. As a result of the unresolved dispute, the contract between IBM and Mazda was terminated, and Mazda entered into a new leveraged lease agreement with another corporation. At the time of termination, each party reserved the right to claim damages against the other, and they now do so.
IBM claims that if the agreement had gone forward, it would have received over $1 billion in rental payments by Mazda and it seeks recovery of its lost profits together with millions of dollars in transaction expenses. Mazda claims that it is IBM which breached its agreements and that as a result of having to negotiate with the new party, it had sustained expenses of additional millions of dollars.
*17 The matter came on for trial before me after both sides had waived a jury. Extended testimony was taken from experts, lawyers and corporate officials and hundreds of documents were introduced into evidence. Despite the voluminous materials submitted, the essential facts are not really in dispute, but the inferences to be drawn and the interpretation of the provisions drafted by the legal teams of the respective parties, called for resolution by the court.
Background
The facts are these. Some time in 1984 or 1985, Mazda made the decision to construct an automobile manufacturing facility in the United States. It chose Flat Rock, Michigan, as the site. It was estimated that construction of the plant would run in excess of $500,000,000. Mazda then sought advice as to the financing method which would result in the lowest cost for financing this new facility. Rather than tie up substantial capital in plant construction, or pay the financing costs on conventional financing, it was concluded that a tax-leveraged sale of the plant and lease-back might prove more advantageous. Such leasing arrangements were being utilized at that time by companies to acquire plants, airplanes or expensive industrial equipment without the immediate outlay of capital. The party which purchased the plant or equipment for the user, if it had substantial taxable income, would be able to enjoy the tax benefits of actual ownership, including deductions for the investment tax credit, accelerated depreciation (ACRS), interest paid on money borrowed to purchase the asset, as well as the residual value of the asset. The capital-expending entity would have had substantial income to be sheltered through such tax write-offs. The purchaser, because of the tax deductions and credits it acquired, could then lease the equipment or facility back to the seller for a reduced rental charge thereby benefitting both purchaser /lessor and the seller/lessee.
Mazda became convinced that rather than making a capital investment of over half a billion dollars, the leveraged lease option would produce a lower cost to it for the construction and use of the manufacturing facility. Mazda employed both Goldman Sachs & Co. and the Sumitomo Bank as comanagers for the proposed transaction. Goldman Sachs, in an attempt to locate a purchaser /lessor, circulated a private offering memorandum to a select group of potentially interested parties who had high taxable income, and invited leveraged lease proposals for a 20-year lease.
*18 After receipt of proposals from several interested parties, including one from IBM, which had commenced handling leveraged leasing in 1984, a decision was made to accept IBM as the single purchaser/lessor, denominated in the documents as owner participant (purchaser / lessor) pursuant to its revised bid dated August 21, 1985. That revised proposal was based on the tax assumption that IBM would have sufficient Federal gross income against which to apply the deductions and sufficient Federal income tax liability against which to apply the investment tax credit.
Thereupon, a commitment letter dated September 13, 1985 was executed by both parties. Annexed to that commitment letter were the principal terms of the agreement and a schedule of the annual rents which would be due during the lease term. Also included in the commitment letter, as it was in both the private placement memorandum and plaintiff’s bid proposal, were, inter alia, provisions for an increase or decrease in the rent to be paid by Mazda as the seller/lessee to reflect any changes from the existing tax code prior to closing which would affect the value of the tax benefits being transferred to IBM. The option was given to Mazda to reanalyze its position and cancel its obligations to proceed. The exercise of the cancellation option would then entail payment by Mazda to IBM of the actual costs and expenses incurred (other than financial advisory fees) with interest as computed under the terms of the commitment letter. The initial closing date was, under the commitment letter, to occur in October 1986 and involve the transfer of cranes and related equipment in an effort to grandfather the transaction before any changes were made in the Tax Code. IBM provided Mazda with an agreed rent schedule specifying the annual rent for each of the next 23 years, aggregating over one billion dollars.
Without detailing the massive efforts by the parties and their counsel in negotiating and drafting a mutually agreeable version of the documents needed to finalize the transaction, on June 13, 1986 IBM and Mazda entered into a leveraged lease agreement dated May 1, 1986, consisting of three parts: (1) the participation agreement; (2) the lease agreement; and (3) the tax indemnification agreement.
In summary, the participation agreement called for adjustment of the rent payable in the event of changes in the tax law prior to the final closing date which would alter the "net eco *19 nomic return” of the lessor.[2] IBM as lessor was obliged to give notice of any changes in the tax law which would require adjustment of the rent, and comparing the cost of such adjusted rent to the cost of conventional financing by the lessee. If the rental payments then turned out to be more expensive than conventional financing, the lessee could then elect to cancel the transaction (the walkaway clause) prior to the final closing date by repurchasing any equipment previously transferred and paying the transaction expense.
The very event that was anticipated, a change in the tax law, came about with the passage of the Tax Reform Act of 1986 (Pub L 99-514, 100 US Stat 2085) on October 22, 1986.
Prior to the passage of the 1986 Tax Reform Act, IBM had counted on tax benefits of $260,000,000 accruing from the transaction.
The Act, however, provided, inter alia, for: (1) lowering of the corporate rate from 46% to 34% on a graduated basis; (2) repeal of the investment tax credit; (3) a change in depreciation schedules.
In addition, the Act also introduced a corporate minimum tax (the alternative minimum tax or AMT) which in essence required corporations with large incomes which had paid little or no tax before because of the way they structured their transactions, to pay a minimum tax of 20%.
This transaction was in part grandfathered from the effects of the 1986 Act with respect to the investment tax credit. However, that part of the investment tax credit that was not grandfathered in total as well as other "Change[s] in Tax Law” which were not grandfathered, called for adjustment as being a "Change in Tax Law” as that term was defined in the three agreements entered into between the parties. There is no dispute about this.
IBM notified Mazda of such a "Change in Tax Law” as would require adjustment of the rental schedules. Mazda accepted the rate adjustments as set forth by IBM. IBM did not at that time include any calculation of the impact of the AMT. The letter closed with the sentence: "Further adjustments will in all likelihood be necessitated as further implications of this new act are understood.”
*20 As a result, an amended and restated participation agreement and lease dated October 1, 1986 was executed which included new rental and other schedules based upon the gradual lowering of the corporate tax rate and other changes in the tax law that affected IBM’s net economic return. Both parties acknowledge that these new schedules were in accordance with the understanding of both parties, but did not reflect any changes in the rental payments based upon the enactment of the alternative minimum tax. Such revisions were relatively minimal in nature.
However, by letter dated January 22, 1987, IBM informed Mazda for the first time that because it might be subject to the AMT, which could only be determined in the future at the end of each taxable year, annual adjustments would be necessary. The letter concluded that because of the AMT:
"IBM’s tax position for any year cannot be determined until after the close of that tax year * * *
"Should IBM be subject to the AMT in a particular year, corresponding adjustments to Rent, Stipulated Loss Value and Termination value will necessarily have to be made as the result is known in order to * * * preserve our Net Economic Return.
"Depending on the length and severity of the AMT effect, Rent adjustments may range in amount from two million or less on a present value basis to in excess of one hundred and thirteen million on a present value basis if IBM is subject to the maximum effect” (emphasis supplied).
Unlike the adjusted calculations for deletion of the investment tax credit, and reduced depreciation and interest deductions, which were calculable based solely with reference to the finances of the Mazda leveraged lease transaction, the impact of the AMT could be determined only in the light of IBM’s total consolidated statement for each individual year, which would be dependent on the totality of IBM’s operations worldwide and, as recognized, could be determined only at the end of each year, when it could be ascertained whether or not IBM’s total global income brought it above or below the minimum tax level of 20%.
It appears that even prior to IBM’s letter to Mazda, IBM knew, through the opinion of outside tax counsel, and by its own internal analysis that there was a potential of AMT liability by IBM, but it did not mention this in the October 31, 1986 letter since, it alleges, it was not certain of the extent to *21 which it would be subject to AMT, if at all. However, IBM alleges that by January 1987, it had projected a worst case scenario and notified Mazda in its letter of January 22, 1987, of both its position that "AMT” was a "Change in Tax Law” for which rental adjustment was required, and that a worst case scenario would subject Mazda to total annual rental adjustments which were potentially in excess of $113 million. The cost of conventional financing to Mazda was estimated by IBM to be $106 million, which it advised Mazda of on February 10, 1987.
Mazda vigorously disputed IBM’s assertion that AMT was such a "Change in Tax Law” as was contemplated by agreement of the parties. Further, since the question of whether IBM would be subject to AMT and the extent of its liability for AMT could only be determined at the end of each taxable year, it was not possible for IBM to deliver to Mazda a revised rent schedule for the 23-year lease period, even though it was obligated to provide it under section 9.02 of the participation agreement. Mazda claims it was therefore not able to calculate which method of financing would be less costly and hence was deprived in effect of its right to exercise its option to cancel the transaction if it turned out that a leveraged lease arrangement would be more costly than conventional financing.
Despite numerous subsequent meetings between the parties, none of the proposals advanced by either side was acceptable to the other and it became apparent that the leveraged lease transaction was in danger of remaining unconsummated.
Because of the impasse Mazda, by letter dated February 26, 1987, notified IBM that it considered it to be in breach of its agreement, and that Mazda would seek to recover its damages if the matter could not be resolved without delay. Thereafter, with no further solution to its dispute with IBM in the offing, Mazda thereupon sought a substitute lessor with whom a new leveraged lease agreement could be concluded quickly, inasmuch as the deadline for concluding this type of transaction while retaining the grandfathered tax benefits was fast approaching.
A new lessor, Philip Morris, was located by Mazda and with IBM’s acquiescence, the crane and related equipment previously transferred to IBM on November 7,1986 was transferred to Philip Morris, with whom a leveraged lease agreement was closed on June 17, 1987 at a lower total rental than the IBM lease had called for. IBM and Mazda entered into a termination agreement allowing the transaction with Philip Morris to *22 proceed, but preserving the rights of both IBM and Mazda against each other for such damages as each might claim.
This action was thereafter commenced in the fall of 1987 by plaintiff IBM which, in its complaint, alleged two causes of action: (1) breach of contract; and (2) unjust enrichment through Mazda’s conclusion of the transaction with a party other than itself. It claims total damages in excess of $111 million, and over $6 million for transaction expenses. Mazda’s answer denies the material allegations of the complaint, and counterclaims for breach of the agreement by IBM, claiming damages of $5,450,000 on a net basis, after taking into account certain savings from the Philip Morris transaction and additional expenses arising therefrom.
Analysis and Decision
Despite the apparent complexity of the wording of the voluminous agreements between the parties which embodied this transaction, the rights and duties of the parties are relatively clear, dependent on a few well-established principles of law and simple rules concerning the plain meaning of the English language and the application of common sense.
Given the armies of legal talent that were mustered, it is fair to assume that every "i” was dotted, every "t” was crossed, and every semicolon was neatly in place. Contingencies which could readily be anticipated but which were never mentioned can fairly be ignored as not within the contemplation of the parties. "The meaning of the language used must be found in the common sense and common speech of the average person (Lewis v Ocean Acc. & Guar. Corp., 224 NY 18, 21)” (Facet Indus. v Wright, 95 AD2d 262, 265), in the light of "the reasonable expectation and purpose of the ordinary business man”. (Burr v Commercial Travelers Mut. Acc. Assn., 295 NY 294, 301.) The subjective interpretation of the parties is of no moment when the words of the agreement, viewed in proper context, provide an unmistakable meaning.
The entire framework of the agreements, which are dependent on the economic benefits to be derived from a shifting of the tax deductions and credits and are the predicate for the rent calculations, is set forth as the basic tax assumptions contained in the tax indemnification agreement. Of particular significance are assumptions (m) and (q) dealing with the owner participant’s (IBM’s) ability to use the tax benefits transferred to it, and the assumptions as to the existing applicable tax rates. These provisions read as follows:
*23 "(m) The Owner Participant will have at all relevant times (i) sufficient/Federal/taxable income against which to apply * * * the ACRS Deductions, the Interest Deductions and the Amortization Deductions and (ii) sufficient liability for Federal income tax against which to apply the Investment Credit * * * "(q) The Owner Participant’s marginal statutory rate of income tax is 46 percent as to Federal Income tax and 7.6737 percent as to state and local income tax, for a composite marginal statutory rate of income tax of 50.144 percent.”
These are not warranties, but IBM’s statement of existing fact and future expectations. Mazda certainly was not giving assurance that the stated conditions would prevail. Only IBM was in a position to know its income position and its taxable status. Its status in the highest tax brackets was the impetus for its bidding for the leveraged lease. The assumptions were the base line from which change would be measured. If IBM was not actually in the highest tax bracket, the deductions it was acquiring might not be fully utilized as it anticipated, but its ability or inability to achieve maximum benefits because of its own financial position was not a postulate of the contract, and adjustments would be called for only by external variants, and not by its own economic position. Mazda could not reasonably be deemed a guarantor of IBM’s continuing prosperity. As IBM’s principal financial officer involved with this transaction conceded, Mazda was not being asked to guarantee a maximum return for the lessor. Mazda assumed no responsibility for IBM’s success in its worldwide operations.
Taking the basic tax assumptions as a starting point, we must then decide what constitutes a "Change in Tax Law”. Article IX of the participation agreement specifies what adjustments to the rent and other factors are to be made in the event of a statutory or regulatory change in the Federal tax code prior to the closing date, pursuant to section 3.03 of the lease. Section 9.01 does not call for adjustments for "any” change in the tax law, as plaintiff contends, but only such change as would "alter the Owner Participant’s Net Economic Return” within the window period, "in order to preserve the same * * * Net Economic Return with respect to the Original Financing as would have been realized * * * if such change in Tax Law had not occurred.” Tax law changes which do not impact on IBM’s net economic return from this transaction have no bearing on the rent adjustments to be made.
"Net Economic Return” is not an amorphous concept, but is precisely defined in Appendix A of the participation agreement *24 with respect to the plant financing as the "after-tax yield, after-tax cash flow and ratio of after-tax cash flow to equity invested”. Indisputably, reference is not to IBM’s global returns in its consolidated statements, but the yield on the equity invested in this particular transaction. The enactment of the AMT might impact IBM’s operations in Singapore or Germany, and its over-all tax position, but it is not to be considered such a change in the tax law as would vary or diminish the net economic return from the investment in the plant at Flat Rock.
In support of its contention that enactment of the AMT is a change in the tax law requiring adjustments in rent, IBM argues that everyone understood that a leveraged lease is not a fixed rent lease, and that the only thing agreed to be fixed was its net economic return. True enough, but that does not mean that the parties were entering into a completely open-ended lease.
The changes in the tax law which called for adjustment were only those which affected the return on investment — lowering of the maximum corporate tax bracket, and the changes with respect to the investment tax credit and accelerated depreciation. The impact of those changes could be readily calculated in short order by any knowledgeable person with the tax codes on one hand and a number-crunching computer on the other.
IBM did, in fact, make the calculations with relative promptness and proposed a new rent schedule within days after the enactment of the Tax Reform Act of 1986. It is indisputable that IBM’s legislative analysts had been well aware of the possibility of the enactment of an AMT well before it took place, and even after it was put in place they never mentioned that the AMT might require even further changes in the rent schedules. Tagging on a nonspecific reservation to the new rent schedule as IBM did in its October 31,1986 letter to Mazda to provide for possible further adjustments could not mean adjustments for AMT over the next two decades. Mazda reasonably believed that it was entitled to know what its rents were going to be for the next 23 years subject to possible relatively minor adjustments, without unknown variables of up to $113 million. Any unilateral recalculation based upon inclusion of the AMT would have thrown the whole matter into unknowable chaos.
It is not surprising, then, that IBM’s announcement on January 22, 1987 came as a bombshell to Mazda. IBM was proposing an open-ended lease with the rents to be payable by Mazda to be dependent on IBM’s own worldwide operations. Its *25 ultimate tax bracket could be influenced by many external factors having nothing to do with the Michigan factory, such as how foreign profits and foreign tax structures would affect tax credits to be taken by IBM, and would involve even natural disasters anywhere in the world which might destroy an IBM plant.
No reasonable and responsible businessman could be expected to sign on to the kind of agreement as construed by IBM. IBM conceded that it could not determine what the rent over original projections would be within the window period prior to the final closing, but could give only approximations that the increase in rent would be anywhere between $2,000,000 and $113,000,000. It was estimated that the cost of conventional financing to Mazda would be about $106,000,000. Thus, there was no way that Mazda could determine for sure whether the ultimate cost of the leasing arrangement would be greater than that of conventional financing. Inasmuch as inclusion of the AMT in the rent formula would require fixing the rent on a year-by-year basis, after the fiscal year had closed and the consolidated balance sheets had been worked up. IBM could not give Mazda "prompt notice”, as required, to enable it to choose whether or not to exercise the walkaway option. Mazda was being asked to buy a "pig in a poke.” The changes in tax law contemplated a fine-tuning of the rent schedules, not a major and inchoate realignment. IBM’s insistence on its new interpretation was truly a deal buster.
The way the deal was structured, the risk of calculable changes which might take place prior to final closing was on the lessee. The risk of changes after the deal had closed would be on the lessor (but it still had a possible out — if the deal became less profitable to it, it could sell off its interest). While reference was made during the trial to other leveraged lease transactions in which possible changes in the AMT were contemplated and explicitly dealt with, that can have no bearing on the instant agreement, the terms and conditions of which are abundantly clear. No fair reading of the documents agreed upon could justify the position of IBM that Mazda would have to compensate IBM for all adverse financial changes running 23 years into the future. Its insistence on that interpretation, its demand for more than the agreements entitled it to, and its refusal to go forward otherwise constituted a breach of the agreement. Faced with unreasonable and untenable demands, Mazda properly sought a hasty renegotiation of the leveraged lease deal with another company.
*26 There is no valid basis upon which the plaintiff can claim unjust enrichment, since even if Mazda used some of the documentary material initially prepared by IBM, it was forced into the position of using whatever it had with a successor lessor. It was not being "unjustly enriched” as a result of its wrongful conduct, but rather was attempting to mitigate the potential damages when forced to cast about for alternatives. (See, McGrath v Hilding, 41 NY2d 625, 629; Mayer v Bishop, 158 AD2d 878.)
Accordingly, the court concludes that it was plaintiff IBM, and not defendant Mazda, that was in breach of the lease, and that there was no unjust enrichment. Plaintiff was in breach in refusing to go forward without the AMT adjustment. "Where a party maintains an untenable construction of a contract on a matter of essential substance, this will be regarded as a repudiation of the contract” (22 NY Jur 2d, Contracts, § 389, at 299 [1982]; Wester v Casein Co., 206 NY 506; Estes v Curtiss Aeroplane & Motor Corp., 191 App Div 719). Plaintiff failed to provide the prompt notice called for by section 9.02 as to valid operative changes and failed to provide a rent schedule prior to the freeze date for the entire lease term and it breached by denying defendant’s right to terminate. The court therefore dismisses plaintiff’s complaint. Mazda, on the other hand, is entitled to judgment on its counterclaim for breach of contract with damages awarded therefor in the sum of $5,450,000 with interest from June 17, 1987 and costs.

. In 1992, the Ford Motor Corp. acquired an interest in Mazda’s United States operations and the entity is now known as Autoalliance International, Inc.

. "Net Economic Return” was defined in Appendix A of the participation agreement, the terms of which will be discussed hereinafter. The tax assumptions on which the transaction was based were set forth in section 1.1 (m) of the tax indemnification agreement and the provision for rent adjustments in section 3.03 of the lease agreement.