### In re KMART CORPORATION, et al., Debtors.

### No. 02 B 2474.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 14, 2007.

---

20. Debtor's schedules indicate that she is single and has no dependants.

Craig Goldblatt, Wilmer Cutler Picker Hale & Dore LLP, Washington, D.C., William J. Barrett, Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLP, Chicago, IL, Michael Snyder, Washington, DC, for Objector.

Thomas J. Magill, Leonard S. Shifflett, Christopher Combest, Quarles & Brady LLP, Chicago, IL, for Claimant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter comes to be heard on the objection of Kmart Corporation ("Kmart") to claims 50112 and 50863 filed by Philip Morris Capital Corporation ("Philip Morris") and claims 50110, 50111 and 50113 filed by its affiliate HNB Investment Corp. ("HNB") (collectively, the "Claims"). An evidentiary hearing was held and the court makes the following findings of fact and conclusions of law. For the reasons stated, the court will enter a separate order determining that the amount of claim number 50863 is $4,737,624 and allowing the same as an unsecured nonpriority claim entitled to treatment under Class 5 of the Plan. Claim numbers 50110, 50111, 50112, and 50113 will be disallowed.[1]

## I. FINDINGS OF FACT

At the times pertinent hereto, Kmart was a Michigan corporation that maintained its principal place of business in Troy, Michigan. Philip Morris and its wholly-owned subsidiary, HNB are Delaware corporations. From at least 1985 through May 2003, Philip Morris was in the business of investing in structured financing primarily to generate tax deferrals. (Transcript of Proceedings ("Trans."), Vol. I, pp. 92–93). The court will collectively refer to Philip Morris and HNB as the "Claimants."

**The Transaction Giving Rise to the Claims**

In May of 1995, Kmart, Claimants, and others entered into a leveraged lease transaction with respect to sixteen parcels of real estate improved with Kmart stores. (Joint Pretrial Statement of Claimants Philip Morris Capital Corporation and HNB Investment Corp. and of Debtor Kmart Corporation Regarding Claims Asserted Against Debtor by Claimants ("Joint Pretrial Statement"), Pt. III, ¶ 1).[2] The stores are located in California, Georgia, Minnesota, New York, Ohio, and Texas. (*Id.*, ¶ 2).

As part of the transaction, sixteen separate Delaware statutory business trusts

---

1. By agreement, claims 42208, 42209, 42289, 42290, 42291, and 42292 filed by Philip Morris or HNB will be withdrawn. (*See* Memorandum in Support of Proposed Findings of Fact and Conclusions of Law Submitted by Claimants, Philip Morris Capital Corporation and HNB Investment Corp., p. 1, n. 1).

2. The transaction is described by Claimants as a "commonly used financing tool in that time period." (Initial Trial Brief of Claimants Philip Morris Capital Corporation and HNB Investment Corp. in Support of their Claims Asserted Against Kmart Corporation, et al. ("Claimants' Initial Trial Brief"), p. 3, ¶ 3).

(the "Owner Trusts"),[3] with Wilmington Trust Company, as trustee, and either Chemical Trust Company of California or William J. Wade, as co-trustees (the "Owner Trustees"), purchased 89–year term estates-for-years interests in the sixteen properties (the "Estates–for–Years") from Kmart for a total of $169,492,251 (the "Purchase Price"). (*Id.*, ¶¶s 1 and 5). The amount of the Purchase Price was arrived at by valuing the sixteen stores using certain "Pricing Assumptions" and "Depreciable Component Assumptions" set out in Exhibit E to the Agreement of Sale of Real Estate. (*Id.*, ¶ 2).

An entity known as the RemainderMart Trust paid Kmart $583,104 for the fee simple interest in the land remaining after expiration of the Estates–for–Years. (*Id.*, ¶ 1; *see also,* Trans. Vol. I, pp. 111–112).[4] Wilmington Trust Company is the trustee and the RemainderMart Limited Partnership is the beneficiary of the Remainder-Mart Trust. (Claimants' Trial Exhibits ("Claimants' Ex.") 4, p. 1).

Claimants are the beneficiaries of the Owner Trusts. (Joint Pretrial Statement, Pt. III, ¶ 7). Before entering into the transaction, Claimants ran a sophisticated complex computer program designed to identify the expected return. (Trans. Vol. I, pp. 96–99). The program generated reports upon which the pricing of the Properties was based (the "ABC Pricing Files"). (*Id.*, pp. 127–129). After considering the results, Claimants collectively invested approximately $22 million in the Owner Trusts to fund payment of twenty percent of the Purchase Price. (Trans. Vol. I, p. 109), *see also,* Claimants' Initial Trial Brief, at page 3, ¶ 3, wherein Claim-

ants describe these funds as being the equity to acquire the Estates–for–Years. This equity investment was allocated among the properties in accordance with information from the ABC Pricing Files. (*See Id.*, ¶ 10). The remaining eighty percent of the Purchase Price was financed by the Bank of New York ("BONY") and Todd N. Niemy, as indenture trustees (collectively, the "Indenture Trustees"), through the acquisition of non-recourse public bond debt. (*Id.*, ¶ 9). The obligations of the Owner Trusts to the Indenture Trustees, documented in a number of Mortgage Notes (*see* Claimants' Ex. 48, p. 13) (the "Notes"), were secured by sixteen separate Indentures, Mortgages and Deeds of Trust, Assignments of Rents and Security Agreements (collectively, the "Indentures"). (*Id.*, Exs. 48–57).

The Owner Trusts leased the properties back to Kmart pursuant to sixteen separate, but materially identical, leases of twenty-five year terms (collectively, the "Leases"). (Joint Pretrial Statement, Pt. III, ¶ 3). Kmart paid the rental payments called for in the Leases to the Owner Trusts. (*Id.*, ¶ 11). The rents were then used by the Owner Trusts to pay down the Indentures and certain Owner Trustees' fees. (*Id.*). After those payments, the "free cash," was transferred by the Owner Trusts to the Claimants. (*Id.*).

The transaction afforded numerous benefits to those involved. Kmart received an immediate infusion of $170 million in cash to use for operational expenses, yet remained in and operated from the stores. (Trans. Vol. I, p. 112).

One of Claimants' goals from the transaction was to obtain a return on their

---

3. Specifically, Real Estate Finance Trusts 1995–K–3 through 1995–K–10, 1995–K–12, and 1995–K–14 through 1995–K–20.

4. The remainderman is a third-party that takes ownership of the land at the conclusion of the lease. (Trans. Vol. I, p. 111). Prior to then, the Owner Trust has use and possession of the land. (*Id.*).

investment from (i) the excess rents received throughout the life of the transaction and (ii) the remaining value of the properties when the Lease terms ended. (Joint Pretrial Statement, Pt. I, ¶ 5); (Trans. Vol. I, pp. 114 and 139). As explained by Steven Seagriff, Philip Morris's Vice President and Chief Compliance Officer, Claimants assumed receipt of the remaining property value "if things are going well." (Trans. Vol. I, p. 120). This remaining property value is also referred to as residual value. (*See Id.*). The residual value of the properties involved here was projected by the parties at the outset of the transaction to be 17.5% of the total purchase price, *i.e.*, approximately $20 million (the "Residual Value"). (Trans. Vol. IV, p. 29). Claimants recognized the risk that the projected and actual Residual Value may differ at the end of the Lease terms (Trans. Vol. I, p. 115), and thus, at the end of the transaction, Claimants would absorb the difference between their estimated Residual Value and a lesser actual value.

Claimants also expected tax benefits from the transaction. Persons in the position of Claimants use the deductions afforded by the transaction to shield corporate income from current tax. (Trans. Vol. I, p. 113); (Trans. Vol. II, p. 88). To understand the tax benefits, one must keep in mind that the Owner Trusts are "pass-through entities." As such, the Owner Trusts are not taxed on income generated by the properties. (Joint Pretrial Statement, Pt. III, ¶ 7). "Instead, [Claimants] bear the tax-related burdens and enjoy the tax-related benefits associated with the Owner Trusts' ownership of the Estates–for–Years in the Properties." (*Id.*). In other words, Claimants are treated as the owners of the properties for tax purposes. Consequently, they are able to offset their gross income by the properties' depreciation. (*Id.*). Similarly, Claimants

are considered to be the borrowers on the non-recourse debt, entitling them to take deductions for interest payments made on the Indentures. (*Id.*, ¶ 13). These tax benefits are in the nature of deferral, not complete extinguishment, of tax liability. (Trans. Vol. II, p. 88–89); (Trans. Vol. III, p. 328–329).

The benefit to the Owner Trusts from the transaction is described by Claimants as the ability to receive rent under the Leases, pay the Owner Trustees' fees and Indenture obligations, and then distribute the excess rent to Claimants. (Joint Pretrial Statement, Pt. I(A), ¶ 5(b)).

A number of documents, in addition to the Leases and the Indentures, were involved in the transaction. (*See,* Claimants' Exs. 1–14, and 35–45). Of these documents, all of the parties, *i.e.*, Kmart, the Owner Trusts, the Owner Trustees, Claimants, the Indenture Trustees and the RemainderMart Trust, entered into a Participation Agreement dated as of May 4, 1995 (the "Participation Agreement"). (Joint Pretrial Statement, Pt. III, ¶ 5). The Participation Agreement defines the roles of the parties and their respective obligations in the transaction. (*See* Claimants' Ex. 1). The Owner Trusts are defined in the Participation Agreement as the "Landlord," Kmart is the "Tenant," and Claimants are the "Owner Participants." (*Id.*).

Claimants entered into separate, but materially identical, Tax Indemnification Agreements dated as of May 4, 1995 with Kmart. (Joint Pretrial Statement, Pt. III, ¶ 5). The court will hereafter refer to both of the Tax Indemnification Agreements in the singular.

**Pertinent Provisions of the Subject Documents**

Claimants made a number of covenants in the Participation Agreement, *including* an affirmative covenant to "hold [them-

selves] out as [ ] legal entit[ies] separate and distinct from the Landlord, [*i.e.* the Owner Trust] ... not commingle [their] assets with those of the Landlord, ... conduct business with Landlord only on an arm's-length basis," maintain separate books, and file their own tax returns. (Claimants' Ex. 1, p. 11, § 5(b)).

Kmart agreed, *inter alia*, not to claim tax ownership benefits with respect to the properties. (*Id.*, p. 14, § 6(h)). Kmart also agreed to a general indemnity, which provides,

> (a) Tenant [Kmart] agrees, whether or not any of the transactions contemplated by [the Participation Agreement], the Purchase Agreement, Leases, Trust Agreements and Indentures and the other Operative Documents ("*Sale and Leaseback Documents*") shall be consummated, to assume liability for, and to indemnify, protect, defend, save, make whole and keep harmless each Indemnitee on an After–Tax Basis, from and against any and all Claims[5] that may be imposed on, incurred by or asserted against any Indemnitee, whether or not such Indemnitee shall also be indemnified as to any such Claim by any other Person and whether or not such Claim arises or accrues prior to the date of this Agreement in any way relating to or arising out of: ... (iii) any of the Operative Documents or any transactions contemplated thereby ...

(*Id.*, pp. 44–45, § 22(a)) (the "General Indemnity"). Section 22(b) includes a number of carve-outs from the General Indemnity (the "Carve–Out"). (*Id.*, p. 46, § 22(b)).

For example, in the Carve–Out the parties agreed that any "Claim in respect of any Indemnified Taxes ..., other than any payment necessary to make payments under this Section 22 on an After–Tax Basis" would not be covered by the General Indemnity. (*Id.*, p. 47, § 22(b)(iii)). Instead, it was understood that Section 23 of the Participation Agreement (a general tax indemnity, which covers, *inter alia*, state business taxes), Article 6 of the Leases (which encompasses *ad valorem* real estate taxes),[6] and the Tax Indemnification Agreement (which as discussed below covers lost tax benefits) provide for Kmart's tax liability. (*Id.*). It was also understood that "[n]othing in this section 22 [*i.e.*, the General Indemnity and the Carve–Out] shall (i) be construed as a guaranty by [Kmart] of any residual value in any Property or as a guaranty of any of the Notes or the Certificates to be issued pursuant to the Pass Through Trust Agreements ..." (*Id.*, p. 49, ¶ 22(g)).

The Tax Indemnification Agreement provides, *inter alia*,

> "**Section 3. *Indemnified Losses.*** (a) Consistent with subsection (b), (i) if as a result of: ... (VII) any pursuit of remedies (whether by the Owner Participant or Indenture Trustee or otherwise) following an Event of Default; ... the Owner Participant ... (B) shall be required to include in gross income for Federal, state or local income tax purposes any amount not described in any of clauses (i) through (vi) of paragraph (i) of Schedule B hereto (an 'Income Inclusion'): (any of the foregoing events ... being referred to hereinafter as a

---

**5.** Claims are defined as "liabilities, obligations, damages, losses, penalties, fines, claims (including, without limitation, Environmental Claims), actions, suits, judgments, administrative or judicial orders, settlements, utility charges, costs, expenses, and disbursements (including, without limitation, reason-

able legal fees and expenses and costs of investigation) of any kind and nature whatsoever, whether or not subject to litigation." (*Id.*, pp. 49–50, ¶ 22(h)).

**6.** (Claimants' Exs. 5–14, pp. 6–15).

'Loss'), Kmart will pay to the Owner Participant an indemnity, determined pursuant to either clause (y) or (z) below."

(Claimants' Exs. 2 and 3, pp. 3–4). The parties here agree that the amount of the tax indemnity is determined utilizing clause (z), which provides,

If Kmart may not or has not elected to pay an indemnity pursuant to clause (y), then Kmart shall pay to the Owner Participant as an indemnity a lump-sum amount which, on an After–Tax Basis, shall be sufficient to preserve the Owner Participant's Economics [7] as if such Loss had not occurred. The computation of such lump-sum amount shall be made by the Owner Participant utilizing the methodology and assumptions, including the Tax Assumptions, utilized by the Owner Participant in determining Basic Rent and Termination Value [8], except as such assumptions shall be varied to take into account such Loss and any prior Loss.... The computation of such lump-sum amount under this clause (z) also shall take into account any past, current and anticipated interest, penalties and additions to tax payable by the Owner Participant as a result of such Loss and any Federal, state or local net income tax benefits reasonably expected to be realized by the Owner Participant by reason of the circumstances or adjustments giving rise to such Loss.

(*Id.*, pp. 5–6).

Clause (y) is described as the "pay-as-you-go" indemnity. If that clause applies, the indemnity amount would be paid by Kmart on an on-going basis, as opposed to as a lump sum.

Kmart must, subject to a number of conditions, pay the tax indemnity to Claimants by a certain date after Kmart's receipt of Claimants' certification of the amount of the indemnity. (*Id.*, p. 6). The court notes that this payment provision in the Tax Indemnification Agreement appears to conflict with provisions in the Leases and the Indentures. To explain, the Leases provide that the amount Kmart owes under the Tax Indemnification Agreement is included in the definition of "Additional Rent" which Kmart pays to the Owner Trusts. (Claimants' Exs. 5–14, pp. 2–3, Art. 3(a)). The Indentures, however, state that the Owner Trusts are expressly denied any claim for amounts owed under the Tax Indemnification Agreements. (Claimants' Exs. 48–57). Read together, however, the provisions mean that the Owner Trusts serve as conduits for the payment of the tax indemnity to Claimants, who are the only parties to the transaction entitled to that indemnity.

**Events During the Bankruptcy Case**

■ Approximately seven years after the inception of the transaction, Kmart and thirty-seven of its affiliates filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Code") on January 22, 2002 (the "Petition

---

7. Owner Participant Economics is defined as the "... Owner Participant's nominal after-tax yield, total after-tax cash flow and total FASB after-tax lease income for the first five years utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions as were utilized in Owner Participant's original calculation of Basic Rent and Termination Value." (Claimants' Ex. 1, p. 44,

¶ 21(d)). The after-tax yield is described by Claimants as "the return that we would expect to receive as the owner participant in the transaction." (Trans. Vol. I, p. 97).

8. The Termination Value, or the stipulated loss value if the Lease is prematurely terminated, of each of the properties is listed on Exhibit D to the Leases.

Date")(Joint Pretrial Statement, Pt. III, ¶ 14). The court thereafter entered an order providing for the joint administration of the cases. (Kmart bankruptcy case docket ("Docket"), no. 3).[9]

Since Kmart's bankruptcy filing constituted an event of default under the Indentures, all principal and unaccrued interest amounts were accelerated and became due under the Indentures. (*See* Trans. Vol. II, pp. 156–159). Consequently, BONY, as Indenture Trustee, exercised its right to recover the rents due under the Leases, including noticing foreclosures on some of the properties. (*Id.*, p. 144). The Owner Trusts eventually executed deeds-in-lieu of foreclosure between May of 2003 and March of 2004, in favor of BONY in satisfaction of the underlying non-recourse mortgage debt with respect to the stores subject to the Rejected Leases, as hereinafter defined. (Joint Pretrial Statement, Pt. III, ¶ 24); (Claimants' Exs. 94–103).

Kmart rejected ten of the Leases during the pendency of the bankruptcy case pursuant to section 365(a) of the Code (the "Rejected Leases").[10] BONY, who had obtained the rights of the Owner Trusts in the Leases, filed proofs of claims in the bankruptcy case asserting damages arising from the rejection of the Rejected Leases and claims for Kmart's use and occupancy of the stores between the Petition Date and the dates of rejection (the "BONY Claims"). (Joint Pretrial Statement, Part III, ¶ 21).

Six of the properties subject to the Rejected Leases (Amsterdam, NY; Mission Viejo, CA; Fresno, CA; Highland, CA; Mankato, MN; and LaFayette, GA) were included in a like-kind exchange transaction pursuant to applicable provisions of the Internal Revenue Code (collectively, the "Like–Kind Exchange"). (*Id.*, ¶ 34); (Trans. Vol. II, p. 55).

On February 25, 2003, this court entered an order finding that the Disclosure Statement related to the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors–in–Possession dated February 25, 2003 (the "Plan") contained adequate information. (Docket no. 8918). That order set April 14, 2003, as the date for commencement of the hearing on confirmation of the Plan and April 4, 2003, as the date by which parties in interest had to file objections to confirmation. (*Id.*). The Plan provided for, *inter alia*, the rejection of unexpired leases of nonresidential property that were not previously assumed or rejected by Kmart during the pendency of the bankruptcy case. (Docket no. 8927, pp. 40–41).

Approximately 165 objections to confirmation of the Plan were filed, including a great many filed by Kmart's landlords. (*See generally*, Docket Nos. 9582 to 10344). One such confirmation objection was filed by BONY. (Docket No. 10035). BONY asserted in its objection that "the Reorganized Debtors should be obligated under

---

**9.** The court takes judicial notice of entries on the Docket and the contents of documents filed in the bankruptcy case, but not the truth of the facts asserted in those documents. Fed.R.Evid. 201; *In re Woodmar Realty*, 294 F.2d 785, 788 (7th Cir.1961), *cert. den.* 369 U.S. 803, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962).

**10.** Specifically, on January 22, 2002, Kmart rejected the Leases for stores in Amsterdam, New York and Mission Viejo, California.

(Joint Pretrial Statement, Pt. III, ¶ 16). In June 2002, Kmart rejected the Leases at four additional properties effective as of June 29, 2002: Fresno, California; Highland, California; LaFayette, Georgia; and Mankato, Minnesota. (*Id.*, ¶ 17). Kmart rejected Leases for the following four stores through the Plan: Hilliard, Ohio; San Antonio, Texas; Sherman, Texas; and Waco, Texas, effective as of April 30, 2003. (*Id.*, ¶ 18).

the Plan to pay rental obligations under the terms of the rejected lease through the later of [the effective date of the Plan] or the date of surrender of the underlying leasehold premises to the landlords." (*Id.* at p. 6). BONY also insisted on another typical landlord requirement in the context of rejected leases, *i.e.,* that "the property be surrendered to the lessor in broom clean condition, with keys and without subtenants." (*Id.*). BONY complained about the "protracted claim objection procedure" proposed in the Plan, noting that the procedure "runs the risk that the holders of Lease rejection claims may receive their anticipated distributions of the publicly traded Kmart stock significantly later than other creditor constituencies." [11] (*Id.,* p. 7). Finally, BONY wanted the Confirmation Order to expressly provide that nothing in Section 7.10 of the Plan "[l]imits or prejudices [BONY's] rights ... to assert ... [its] rights as administration creditors, entitled to payment as administration creditors under the Plan, and not solely from any distribution made to holders on account of Lease rejection damage claims." (*Id.,* pp. 8–9).

On April 22, 2003, Kmart, BONY, and numerous lessors entered into the Stipulation Resolving Certain Lessor Objections to Confirmation and Establishing Agreed Claims Resolution Procedures (the "Lessor Claim Stipulation"). (Docket No. 11107). The Lessor Claim Stipulation provided, *inter alia,* that in exchange for the withdrawal of the lessors' plan objections, Kmart agreed to an expedited claims reso-

lution procedure with respect to the lessors' claims. (*Id.*). Kmart and BONY entered into a similar, but separate, stipulation providing for BONY's withdrawal of its plan confirmation objection. (Docket No. 11104).

On April 23, 2003, this court entered an order confirming the Plan. (Docket No. 10871). Approximately one month later, on May 28, 2003, Kmart objected to the BONY Claims in its Omnibus Objection to Rejection Damages Claims. (Docket No. 12614). An evidentiary hearing on Kmart's objection to the BONY Claims was scheduled for July 31, 2003. (Docket No. 12855).

BONY and Kmart reached a resolution of their disputes prior to the hearing and memorialized their agreement in a proposed order submitted to the court. On September 26, 2003, the court entered the Order with Respect to the Bank of New York, as Trustee Claims Subject to Expedited Treatment Pursuant to the Stipulation Resolving Certain Lessor Objections to Confirmation and Establishing Agreed Claim Resolution Procedures Dated April 22, 2003 and Motion to Determine and Allow Claims under 11 U.S.C. §§ 102(1), 105(A) and 502(B) and Fed. R. Bank. P. 3007 (the "BONY Order"). (Docket No. 18141). The BONY Order provides for, *inter alia,* allowance of the BONY Claims in the amounts listed on the attached Exhibits A and B attached thereto. [12] (*Id.*).

Kmart was directed to serve copies of the BONY Order on counsel of record for the Owner Trustees and Claimants, who

---

**11.** As discussed in the Disclosure Statement, the Plan places unsecured nonpriority Trade Vendor/Lease Rejection Claims in Class 5 of the twelve classes of claims against the estate. (Docket No. 8925, p. xiii). The Plan further provides that holders of Allowed Claims in Class 5 will receive, *inter alia,* a *pro rata* distribution of 31,945,161 shares of common stock in reorganized Kmart. (*Id.*).

**12.** Exhibit A lists BONY's unsecured nonpriority rejection damage claims and administrative period claims associated with the Rejected Leases. Exhibit B lists BONY's administrative claim for Indenture Trustee fees.

then had ten days to "file any objection to the allowance and payment of the Allowed Administration Claims as set forth on *Exhibit A* ...; barring any such objection, Administrative Claims, if any asserted by the Owner Trustees and [Claimants] on account of post-petition, pre-rejection taxes [with respect to the Rejected Leases], shall be deemed satisfied and disallowed and the Allowed Administration Claims set forth on *Exhibit A* shall be paid within two (2) business days thereafter." (*Id.*).

Claimants received the BONY Order and were presumably concerned about its language enough to ask Kmart and BONY for a clarification. Kmart, BONY, and Claimants agreed to amend the BONY Order to accommodate Claimants' request for clarification. On November 3, 2003, the court entered the Amended Order with Respect to the Bank of New York, as Trustee Claims Subject to Expedited Treatment Pursuant to the Stipulation Resolving Certain Lessor Objections to Confirmation and Establishing Agreed Claim Resolution Procedures Dated April 22, 2003 and Motion to Determine and Allow Claims under 11 U.S.C. §§ 102(1), 105(A), and 502(B) and Fed. R. Bankr.P. 3007 (the "Agreed Order"). (Docket No. 18718). The Agreed Order provides, in part,

> ... it appearing to the Court that ... (iv) upon the Stipulation Resolving Certain Lessor Objections to Confirmation and Establishing Agreed Claims Resolution Procedures, dated April 22, 2, 2003 (Docket No. 11063); (v) a hearing having been held before this Court on August 13, 2003 whereat the terms of a resolution of Kmart's objection to certain claims asserted by ... (b) The Bank of New York as Trustee of certain 1995 K–1, K–2 Pass Through Certificates ... were placed on the record; and (vi) the Trustees having represented that they are, ..., the sole parties in interest entitled to receipt of the distributions on account of the lease rejection

Unsecured Claims asserted in connection with the properties set forth on *Exhibit A;* and ... (ix) this Court having entered ... [the BONY Order]; and (x) [Claimants] having requested a clarification of certain provisions of the [BONY Order]; and (xi) Kmart, the Trustees and [Claimants] being in agreement on the provisions set forth below amending the [BONY Order]

> ...

> ORDERED THAT this Order and the [BONY Order] shall be without prejudice to (a) any and all claims that the Owner Trustees or Owner Participants have asserted under any Participation Agreement, Tax Indemnification Agreement or other instrument or agreement related to the Scheduled Leases (the "Related Documents") for attorneys' fees, trustees fees, indemnification claims and other obligations that may be due by virtue of any rejection, breach or termination of the Scheduled Leases or the Related Documents (the "Owner Claims") and (b) any and all defenses, objections and counterclaims the Debtors may have to the Owner Claims; *provided however,* the Owner Claims shall not include damages of the lessors resulting from termination or rejection of the Scheduled Leases that are subject to the limit set forth in Section 502(b)(6), which claims shall be held exclusively by [BONY], respectively. [BONY] acknowledge[s] that the claims of [BONY] do not include any claims for the fees and expenses of Owner Trustees and Owner Participants and claims for indemnification of Owner Trustees and Owner Participations (*sic*) arising under the Scheduled Leases and Related Documents.

(*Id.*).(emphasis in original).

Between July 31, 2002 and June 5, 2003, Claimants filed the Claims involved here which total $30,374,127. (Joint Pretrial

Statement, Pt. III, ¶ 19); (Claimants' Exs. 24–34). The Claims assert $21,080,373 under the Tax Indemnification Agreement and $9,293,754 under the General Indemnity.[13] (Joint Pretrial Statement, Pt. III, ¶ 35); (Claimants' Ex. 46). The General Indemnity portion of the Claims consists of $8,864,756[14] as the amount of the unreturned portion of the equity investment that Claimants lost in the transaction, and $428,998 for reimbursement of out-of-pocket expenses associated with the transaction, such as attorneys' fees and property inspection charges. (Claimants' Ex. 46A).

Kmart objected to the Claims in its nineteenth and twentieth omnibus claim objections. (Joint Pretrial Statement, Pt. III, ¶ 22). An evidentiary hearing was held on the objection to the Claims. At that hearing, Kmart, subject to preclusion arguments discussed below, stipulated to the allowance of the full amount of the out-of-pocket expense reimbursement claim, leaving the lost equity investment under the General Indemnity and the tax indemnity amount under the Tax Indemnification Agreement at issue. Kmart also stipulated that to the extent the Claims are allowed, they will be treated as Class 5 claims under the Plan.

**Arguments of the Parties**

Kmart contends that the amount of the Claims are subject to the cap of section 502(b)(6) of the Code. Section 502 provides, in relevant part,

(a) A claim . . . is deemed allowed, unless a party in interest . . . objects.

(b) . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502.

In accordance with section 502(b)(6), a nonresidential real property lessor's claim

---

**13.** Kmart did not seek to reject (or assume) the Participation Agreement and the Tax Indemnification Agreement. "Nevertheless, [Claimants] and the Owner Trustee have assumed for purposes of filing [the Claims] that Kmart intended to, and did, reject the Participation Agreement and Tax Indemnification Agreement[] as such agreements related to the Rejected Leases." (Omnibus Response of Certain Owner Trusts . . . and [Claimants] to Kmart's Nineteenth Omnibus Objection to Claims and Twentieth Objection to Claims, p. 3; see also Claimants' Initial Trial Brief, p. 5, ¶ 7 and p. 12, ¶ 30). In their Proposed Findings of Fact and Conclusions of Law, Claimants advance a different approach, arguing

that Kmart breached the Participation Agreement and the Tax Indemnification Agreement, independent of the rejection of the Rejected Leases. (p. 37). In any event, the distinction of how the breach occurred appears irrelevant as Kmart acknowledges liability under the agreements, leaving the issue of the extent of damages to determine. (See, Reorganized Debtors' Memorandum in Support of Their Proposed Findings of Fact and Conclusions of Law, p. 13).

**14.** This amount was revised to $8,609,824 at trial to account for a mathematical error. (Trans. Vol. III, pp. 202–203).

for damages resulting from lease termination is allowed, but only up to a certain amount, *i.e.,* the amount of the claim is subject to the section 502(b)(6) cap. As noted earlier, the Owner Trusts are identified as the Landlords in the transaction and they alone executed the Leases as lessor. BONY succeeded to the Owner Trusts' claims as landlords and by filing the BONY Claims asserted the Owner Trusts' claims for damages arising from rejection of the Leases. One would assume, therefore, that the BONY Claims are the "lessor claims" in the transaction subject to the section 502(b)(6) cap.

Kmart urges the court, however, to look beyond the labels given to the various parties in the leveraged lease transaction. Kmart contends that the "actual roles of the parties must trump their stated titles." (Reorganized Debtors' Memorandum in Support of Their Proposed Findings of Fact and Conclusions of Law ("Kmart's Memorandum"), p. 17). According to Kmart, the economic reality of the transaction mandates that Claimants be considered the "true lessors" of the stores at issue and that the Claims they assert resulted from the termination of the Rejected Leases. Consequently, the Claims asserted by Claimants are really "claims of lessors for damages resulting from the termination of leases of real property," subject to application of the section 502(b)(6) cap.

Kmart further contends that the section 502(b)(6) "claims of lessors" with respect to the termination of the Rejected Leases have already been satisfied by the payment of the BONY Claims pursuant to the terms of the Agreed Order. Therefore, because the claims of the lessors in the transaction have already been satisfied, these Claims should be disallowed in their entirety. That argument strikes the court as something more than arguing that Claimants are asserting duplicate claims. Indeed, although Kmart does not expressly ask the court to apply claim preclusion, it employs the language of that doctrine by requesting extinguishment of the Claims in this proceeding based on the terms of the Agreed Order entered in a separate prior proceeding. (*See Id.,* Ex. B, ¶¶ 3 and 4)("A claim for damages resulting from the termination of a lease was already allowed to [BONY] by order of this Court ... [t]he Claimants' claims for damages are therefore properly disallowed."). Therefore, the court will address Kmart's argument for disallowance of the Claims based on the Agreed Order as a request to block Claimants' assertion of the Claims pursuant to the doctrine of claim preclusion.

One aspect of Kmart's argument for preclusion of the Claims is premised on fairness. From Kmart's perspective, the transaction was deliberately structured using the artifice of the Owner Trusts as lessors even though in reality Claimants were the "true lessors." The motivation for using owner trusts in the transaction was to protect the Claims from the operation of the section 502(b)(6) cap should Kmart file for bankruptcy relief. Kmart further argues that by allowing the Claims in the full uncapped amount, the claims of Kmart's other unsecured creditors will be unfairly diluted. Moreover, if the Claims are not precluded, the court will have put its imprimatur on similar future manipulations of transactions by persons bent on avoiding application of the section 502(b)(6) cap.

■ For their part, Claimants explicitly argue that the Agreed Order should be given claim preclusive effect, but against Kmart. They argue that the section

502(b)(6) "defense"[15] against the Claims here, was determined by the entry of the final Agreed Order or could have been determined in the proceeding leading up to the entry of that order, *i.e.*, the contested objection to the BONY Claims.

Alternatively, they argue that Kmart should be estopped from raising the issue of the application of the 502(b)(6) cap to the Claims pursuant to the doctrine of issue preclusion. According to Claimants, the issue of which claims in the leveraged lease transaction are capped was decided in the Agreed Order. Specifically, the Agreed Order determined that BONY was the exclusive holder of claims in the transaction arising under the Leases subject to the 502(b)(6) cap and that the Claims here which arose under the other documents in the transaction are separate and distinct from the BONY Claims.

Claimants contend that even if Kmart is not precluded under claim preclusion or issue preclusion from invoking section 502(b)(6), the cap does not apply to the Claims as a substantive matter. In this regard, Claimants argue that the Claims do not satisfy the two predicates for imposition of the 502(b)(6) cap, *i.e.*, the Claims are not claims of a lessor and they did not arise as a result of the termination of the Rejected Leases.

Putting aside its preclusion and section 502(b)(6) arguments, Kmart acknowledges that Claimants are entitled to allowed claims under the Tax Indemnification Agreement. Kmart, however, disputes the amount of the Claims.

In this regard, it is clear that the amount of the Claim under the Tax Indemnification Agreement is to be calculated by Claimants pursuant to a stated formula taking into account certain assumptions. As discussed in detail below, Claimants calculated a total tax indemnity claim of $21,080,373.[16] Kmart does not dispute the calculation, *per se*, but argues that it is incomplete. Specifically, Kmart contends that Claimants failed to take into account necessary reductions from the calculation. Had those reductions been taken, the tax indemnity claim would be $4,339,000. Claimants disagree, however, arguing that the provision of the agreement stating the method for calculating the claim under the Tax Indemnification Agreement is a form of liquidated damages provision under New York law.[17] Thus, the reductions Kmart wants cannot be taken.

As for the disputed portion of the Claims asserted under the General Indemnity, Claimants assert that the Participation Agreement was written to insure that Claimants would recover their investment either from the receipt of excess

---

**15.** The court puts quotations around the word defense here because of its hesitation to recognize section 502(b)(6) as a traditionally defined defense. A defense is an affirmative extraneous reason to excuse or exculpate one from an admitted liability. *In re Kmart*, 318 B.R. 409, 412–13 (Bankr.N.D.Ill.2004)(citing *Van Schouwen v. Connaught Corp.*, 782 F.Supp. 1240, 1246 (N.D.Ill.1991); *In re National Lumber and Supply, Inc.*, 184 B.R. 74, 77 (9th Cir. BAP 1995)). Section 502(b)(6) is a creature of the bankruptcy claims determination and allowance process designed to limit, not excuse, liability. *See In re Fifth Ave. Jewelers, Inc.*, 203 B.R. 372, 376 (Bankr. W.D.Pa.1996); *Kohn v. Leavitt–Berner Tan-*

*ning Corp.*, 157 B.R. 523, 527 (N.D.N.Y.1993); *In re Farley*, 146 B.R. 739, 744–45 (Bankr. N.D.Ill.1992).

**16.** The calculation was presented in a consolidated damage model prepared by Claimants and included in their Rule 26(a) Initial Disclosures served on Kmart on February 28, 2005, which was later amended and admitted at trial. (Claimants' Ex. 46).

**17.** The parties agree that New York law governs interpretation of the Participation Agreement and Tax Indemnification Agreement.

rents throughout the transaction and the Residual Value at its successful conclusion or from Kmart, by virtue of language in the General Indemnity, which purportedly indemnified Claimants from a loss of investment.[18] Kmart disagrees, pointing to the language of the General Indemnity clause. This clause expressly forbids construing the indemnity as a guaranty of the Notes (which were paid by the rents) and Claimants' realization of Residual Value. From Kmart's perspective, Claimants' demand for satisfaction of their lost equity investment is equivalent to a demand for the rents and Residual Value which is specifically carved out of the General Indemnity. Alternatively, Kmart argues that if the indemnity did reach as far as Claimants contend, Claimants used an improper rate of return in calculating the lost investment claim. Kmart believes that the "true equity balance" is $285,138.

The court will address each of the arguments in order.

## CONCLUSIONS OF LAW
### Jurisdiction and Venue

■ This court has jurisdiction over this matter which concerns the allowance of a claim asserted against the estate of a bankrupt debtor. 28 U.S.C. § 1334(b). This is a core proceeding. 28 U.S.C § 157(b)(2)(B). Venue is proper in this court. 28 U.S.C. § 1409(a).

### Application of Claim Preclusion or Issue Preclusion

The parties and many courts, including this one, often use the phrases *res judicata* and collateral estoppel. The court and litigants should, however, endeavor to address these concepts in terms of claim preclusion and issue preclusion, and the court has done so here to avoid imprecision. *See Rekhi v. Wildwood Industries, Inc.*, 61 F.3d 1313, 1316–17 (7th Cir.1995).

### Claim Preclusion

■ Claim preclusion is based on the principle that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Matter of Kroner*, 953 F.2d 317, 320 (7th Cir.1992)(quoting *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981)). Claim preclusion "bars a subsequent claim if it is based on the same, or nearly the same factual allegations." *In re Pre–Press Graphics Co., Inc.*, 300 B.R. 902, 908 (Bankr.N.D.Ill.2003)(citing *Herrmann v. Cencom Cable Assocs. Inc.*, 999 F.2d 223, 226 (7th Cir.1993); *Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 447 (7th Cir. 1994)). The doctrine applies to defenses as well as claims. *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1234 (7th Cir. 1986); *Schlangen v. Resolution Trust Corp.*, 934 F.2d 143, 147 (7th Cir.1991). The "basic rationale" of claim preclusion is "that there must be end to litigation, and that end naturally follows the conclusion of a full and fair opportunity to litigate the claim and all aspects thereof." *Kroner*, 953 F.2d at 320.

■ Because of "... the need to achieve justice through res judicata, there is little room left for loose exceptions." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 4415 at 351 (2002). For example, courts cannot preclude a claim based on the equities of the matter before them.

---

**18.** Although Claimants acknowledge that there is "... no obligation upon Kmart to see that the Owner Participant receives a return of its investment or a return on its investment," Claimants nonetheless assert that Kmart indemnified them for their lost equity investment. (Claimants' Initial Trial Brief, p. 4 ¶ 5).

*Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981)(rejecting lower court's efforts to render "simple justice," noting that, "[t]he doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case."). The Supreme Court "has stressed '[t]hat the doctrine of *res judicata* is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, "of public policy and of private peace," which should be cordially regarded and enforced by the courts.'" *Id.* (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917)). Accordingly, to the extent Kmart's claim preclusion argument relies on fairness, it is rejected.

 The doctrine of claim preclusion applies to bankruptcy court decisions. *Katchen v. Landy,* 382 U.S. 323, 334, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966). In light of the severable nature of proceedings before them, bankruptcy judges can be called upon to decide whether to give claim preclusive effect to one of their own prior orders. *See, In re Snider Farms, Inc.,* 83 B.R. 977, 986 (Bankr.N.D.Ind. 1988); *Kroner,* 953 F.2d 317 (an order entered in one adversary proceeding given preclusive effect in a separate subsequent adversary proceeding); *Pre–Press Graphics,* 300 B.R. 902 (Bankr.N.D.Ill. 2003)(claim preclusion considered with respect to an order entered in connection with an administrative claim on a second administrative claim).[19] Importantly however, an order entered by a bankruptcy judge in a non-core matter within which a party did not consent to the entry of final orders is not to be given preclusive effect in a subsequent action. *Barnett v. Stern,* 909 F.2d 973, 979 (7th Cir.1990).

 The federal rule of claim preclusion is employed when the prior suit in

---

**19.** A relatively recent Seventh Circuit opinion may cause one to question the application of claim preclusion to a bankruptcy court order in a later contested proceeding before the same bankruptcy judge. *See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 543 (7th Cir.2003). In *Qualitech,* the bankruptcy judge entered an order allowing the debtor to sell substantially all its assets, including a steel mill, free and clear of all interests pursuant to section 363(f) of the Code. Later, a lessee in the building, who had not objected to the bankruptcy sale, commenced a lawsuit in state court against the purchaser for a declaration that the bankruptcy sale did not defeat the lessee's possessory interests. The lawsuit was removed to district court and referred to the bankruptcy judge who entered the sale order. The reorganized debtor also asked the bankruptcy court to clarify the order. The purchaser raised claim preclusion as a defense, arguing that the lessee's possessory interest was extinguished by the sale order. The Court of Appeals concluded that claim preclusion was not applicable in a removed diversity action referred by the district court to the same bankruptcy

court that entered the sale order. Rather, the district court's referral of the lawsuit to the bankruptcy court that was also considering a request to clarify meant that "the entire issue was put before the very judge who issued the Sale Order and in the same bankruptcy proceeding. This turn of events renders res judicata inapposite." *Id.* The Court's holding has been described as a special exception to the general rule that "[b]ankruptcy judgments can establish both claim and issue preclusion in later bankruptcy proceedings, according to the ordinary preclusion rules that also may deny preclusion." 18B Wright, Miller and Cooper, *Federal Practice and Procedure Juris.* 2D § 4470.3 (2006). The *Qualitech* decision is a "special preclusion rule[ ] . . . appropriate for matters peculiar to bankruptcy administration." *Id.* The matter before this court involves two contested claim objections, akin to two separate causes of action. This situation does not involve an attack on a sale order via a subsequent declaratory action that impinged on the administration of the bankruptcy case as in *Qualitech.* Accordingly, the court will consider the claim preclusion arguments raised here.

which the order that might be given preclusive effect was commenced in federal court. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001)(citing *Stoll v. Gottlieb*, 305 U.S. 165, 171–72, 59 S.Ct. 134, 83 L.Ed. 104 (1938)); *Matter of Energy Co-op., Inc.*, 814 F.2d 1226, 1230 (7th Cir.1987)(*citations omitted*). The party asking for its application has the burden of establishing preclusion. *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 933 (7th Cir.2003)(citing *Kulavic v. Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507, 517 (7th Cir.1993)). Doubts are resolved against preclusion. *Id.* (citing *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 562 (9th Cir. BAP 2002)).

■ Three showings must be made before a claim will be precluded: (i) an identity of the parties or their privies; (ii) an identity of the causes of action; and (iii) a final judgment on the merits. *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 177 (7th Cir.1995)(citing *Barnett v. Stern*, 909 F.2d 973, 979 (7th Cir.1990)). The fact that an earlier cause of action ended with a consent judgment "does not prevent the earlier judgment from having a res judicata effect." *Martino v. McDonald's System, Inc.*, 598 F.2d 1079, 1083 (7th Cir.1979), *cert. den.*, 444 U.S. 966, 100 S.Ct. 455, 62 L.Ed.2d 379 (1979)(*citations omitted*).

■ Finding the presence of the same parties in the prior and current lawsuits appears to be a straightforward and easy task. Finding the existence of privity with a party in a prior lawsuit is harder to pin down. *See People Who Care*, 68 F.3d at 177. However, "[w]hile '[p]rivity is an elusive concept,' it is generally applied to those with a sufficiently close identity of interests." *Id.* (citing *In re L & S Industries, Inc.*, 989 F.2d 929, 932 (7th Cir. 1993)). Importantly, however, "privity

does not automatically arise" if the prior and current litigants share a close relationship, rather, "[s]ome additional link is necessary." *L & S*, 989 F.2d at 934. For example, a qualifying link would exist to trigger claim preclusion, if a corporate shareholder asserted a right belonging to the corporation in a prior lawsuit which the corporation attempted to assert again in a second lawsuit. *Id.* In any event, when determining whether privity exists, the court must view the facts involved in the two suits with enough specificity to "ensure fair notice to the parties and to yield predictable results." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852–53 (7th Cir.1996).

■ Courts have developed factors to consider when deciding whether privity is present. These factors include the extent of control the party in the second lawsuit exerted over the first lawsuit in which he was not a named party; the existence of "deliberate maneuvering" to avoid the effects of the judgment entered in the first lawsuit; the "close relationship between the parties;" and "whether the prior relationship justifies binding the nonparty to the prior judgment." *Pferdes v. International Sporthorse Registry, Inc.*, 1999 WL 1206640, *10 (N.D.Ill. Dec. 13, 1999)(citing *Tice v. American Airlines*, 162 F.3d 966, 971 (7th Cir.1998)).

■ Privity with a party may also be found in situations involving virtual representation. Under the doctrine of virtual representation, "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to [be] his virtual representative." *Id.* (quoting *Tice*, 162 F.3d at 970). Thus, virtual representation does not require the finding of a "close relationship" between the parties, but a close alignment of interests held by

the parties. The alignment of interests, however, must be "so parallel" as to demonstrate a "virtual representation." *Id.*

■ The Seventh Circuit has expressed misgivings about using virtual representation to satisfy the same party or privity element of claim preclusion, "[w]e think the term 'virtual representation' has cast more shadows than light on the problem to be decided. As a matter of fact, a finding that nonparties were virtually represented in earlier litigation has rarely been used actually to bar litigation. As far as we can tell, *no* published opinion by this court has done so." *Tice v. American Airlines,* 162 F.3d 966, 971 (7th Cir.1998), *cert. denied* 527 U.S. 1036, 119 S.Ct. 2395, 144 L.Ed.2d 795 (1999)(emphasis in original). Indeed, serious due process problems could arise if the virtual representation concept is misused. *Id.* The bottom line on virtual representation is "whether there was (or should be implied by law) the kind of link between the earlier and later plaintiffs that justifies binding the second group to the result reached against the first." *Id.*

■ The second requirement of claim preclusion is met by establishing the existence of an identity of causes of action. Such identity exists where there is a "single core of operative facts giving rise to a remedy." *Doe v. Allied–Signal, Inc.,* 985 F.2d 908, 913 (7th Cir.1993). This test is referred to as the "same transaction" test, or "operative facts" test. *See Energy Co-op.,* 814 F.2d at 1230; *Pre–Press Graphics,* 300 B.R. at 908. Importantly, "[t]he fact that claims have different legal bases does not by itself create separate causes of action." *Id.* at 1231, n. 7.

The *Energy Co-op* case is a helpful illustration of how the same transaction test works. That case involved an order entered in an adversary proceeding brought by the debtor against a former vendor to recover an account balance owed under their contract. The proceeding was concluded with the entry of a "Compromise Authorization Order." *Id.* at 1228. Thereafter, the debtor commenced a second adversary proceeding to avoid and recover a transfer made by the debtor to the same vendor in the 90–day preference period before the petition date. The vendor prevailed on the *res judicata* defense it raised in the second adversary proceeding based on the Compromise Authorization Order entered in the first adversary. On appeal, the Court agreed, concluding that "[b]ecause each claim [*i.e.,* the account receivable claim and the preference claim] seeks to reconcile the parties' obligations under their contract and because the time periods covered by the two claims overlap, we conclude that the two arise out of the same transaction." *Id.* The Court quoted with favor the district court's conclusion that "the rights and obligations of the parties under the [contract] were a necessary factual underpinning for the preference case." *Id.*

■ As noted, the last requirement for claim preclusion is a final judgment. The Seventh Circuit has observed that " 'final' does not mean the same thing in bankruptcy as in other federal cases." *Matter of Fox,* 762 F.2d 54, 55 (7th Cir.1985). It is recognized, however, that a proceeding to establish a claim against the bankrupt estate is final "when it is over and done with." *Id.; see also, Katchen,* 382 U.S. at 334, 86 S.Ct. at 475 (in bankruptcy, "a creditor who offers a proof of claim and demands its allowance is bound by what is judicially determined."). Indeed, a claim allowance order is final even though the actual amount distributed to the creditor is unknown at the time. *Id.* at 56. (observing that "[t]he idea of a severable proceeding within the overall bankruptcy proceedings would have no meaning otherwise.").

In this matter, of the three requirements for claim preclusion, only the finality of the prior judgment is clear. Unquestionably, the Agreed Order is final; it resolved the contested objection to the BONY Claims by allowing the claims against Kmart's estate in certain amounts, thus entitling BONY to distributions under the Plan.

Clearly, Claimants were not parties to the contested proceeding commenced when Kmart objected to the BONY Claims. Claimants did not intervene and were not joined in that proceeding. The mere fact that Claimants may have made an "informal objection" to the BONY Order that lead to the entry of the Agreed Order, does not appear by itself to elevate them to party status, and at least neither party argues as such.

■ Moreover, it has not been established that Claimants were in privity with BONY. Because Kmart did not frame its arguments in terms of claim preclusion, it did not directly argue that Claimants were in privity with BONY. Claimants, although they expressly argued for claim preclusion, did not address the privity requirement.

■ In any event, the court is not obliged to construct arguments for either party, *see In re Zeigler*, 320 B.R. 362, 382 (Bankr.N.D.Ill.2005), but it will briefly discuss privity here to illustrate the unresolved questions it has on that point and thus the failure of both parties here to satisfy the burden to warrant claim preclusion. Claimants' involvement in the BONY Claim objection, as far as the court can tell from the record, was limited to requesting a clarification of the BONY Order. Without more, it is difficult to conclude that Claimants' participation rose to the level of privity necessary to call Claimants *de facto* parties to the BONY Claim objection proceeding. *See* 18A Wright, Miller, and Cooper, *Federal Practice and Procedure Juris.* § 4451 (2d ed.2006).

Moreover, even though there is a relationship between BONY and Claimants by virtue of their involvement in the transaction, it has not been established that they shared a "sufficiently close identity of interests." *See Central States, Southeast and Southwest Areas Pension Fund v. D Investments, Inc.,* 2002 WL 1759938, *4 (N.D.Ill. July 30, 2002)(noting that "[a]t a minimum, the issues on which preclusion is sought must be common to both cases, and the claims or defenses of the two allegedly equivalent parties must be the same."). In fact, the opposite is more true. BONY asserted typical landlord claims associated with Kmart's occupation of the stores during the postpetition/prerejection period and claims arising from the Rejected Leases involved in the transaction. Claimants were agreeable to BONY receiving satisfaction of those claims, but they wanted to make it clear that other claims in that transaction were not resolved by the BONY Order. For this same reason, it cannot be said that Claimants are in privity with BONY or that BONY was the Claimants' virtual representative.

■ Satisfaction of the identical cause requirement is plagued by similar doubts. The first cause of action here was the contested claim proceeding between Kmart and BONY concerning the BONY Claims. This present cause involves a separate objection to different claims. Although the BONY Claims and the Claims here arise from the same transaction, it cannot be said that the rights and obligations of BONY, and those of Claimants, under the various documents involved in the transaction share the same factual underpinnings as in the *Energy Co-op* case example. A ruling on the allowance of the BONY Claims which are based on terms of the Rejected Leases against the Kmart estate

has little if anything to do with determining the amount of the Claims based on the separate Tax Indemnification Agreement. Moreover, although the portion of the Claims based on the General Indemnity in the Participation Agreement has to some extent its basis in the rents, it is still sufficiently separate from the BONY Claims. Stated another way, the process of reconciling the obligations of Kmart to Claimants is a separate exercise from the reconciliation of Kmart's obligations to BONY. Again, the purpose of the Agreed Order was to ensure to Claimants' satisfaction, with Kmart and BONY's consent, that the BONY Claims are distinct from, not identical with, the Claims.

In sum, the court has doubts about the application of claim preclusion in this matter and neither party has met the burden to establish satisfaction of all the elements. Accordingly, the court will not employ the doctrine of claim preclusion in this matter.

**Issue Preclusion**

Issue preclusion applies to bankruptcy decisions. *Katchen,* 382 U.S. at 334, 86 S.Ct. 467. The doctrine "limits the relitigation of specific issues ... as distinct from the relitigation of entire cases or claims ('claim preclusion')." *Rekhi,* 61 F.3d at 1316–17; *Ferrell v. Pierce,* 785 F.2d 1372, 1384 (7th Cir.1986); *American Nat. Bank & Trust Co. v. City of Chicago,* 636 F.Supp. 374, 377 (N.D.Ill.1986)(" 'issue preclusion,' ... forbids litigants from relitigating issues actually resolved in an earlier proceeding.")(quoting *Migra v. Warren City School District, Board of Education,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894, n. 1, 79 L.Ed.2d 56 (1984)). While it ordinarily involves issues of fact, issue preclusion can also apply to rulings of law. *Rekhi,* 61 F.3d at 1317.

To be precluded, "1) the issue ... must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." *People Who Care,* 68 F.3d at 178 (citing *Freeman United Coal Mining Co. v. Office of Workers' Compensation Program,* 20 F.3d 289, 293–94 (7th Cir.1994); *La Preferida v. Cerveceria Modelo,* 914 F.2d 900, 906 (7th Cir.1990)). When issue preclusion is used offensively, as it is here, it is not necessary to demonstrate mutuality of parties. *Warren v. McCall,* 709 F.2d 1183, 1185 (7th Cir.1983)(citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).

The "actual litigation" element is of particular concern when a consent judgment is involved. A consent judgment is usually entered before the conclusion of the fact-finding process of a trial. It is a stipulated agreement, approved by the court and designed to end the costs and uncertainties of "actual litigation." The lack of actual litigation does not mean, however, that issue preclusion does not apply in cases involving consent judgments, at least under the federal law of preclusion. Consent judgments are given preclusive effect "where the factual findings necessary to a judgment are incorporated" into the consent judgment or "where parties have 'indicated clearly the intention that the decree to be entered shall ... determine finally certain issues.' " *People Who Care,* 68 F.3d at 178, n. 5 (*citing Klingman v. Levinson,* 831 F.2d 1292, 1296 (7th Cir.1987)). The intent to give conclusive effect is gleaned from the language of the consent judgment. *See Klingman,* 831 F.2d at 1296 (from a reading of the subject consent judgment's language, the Court stated, "[i]t is certainly reasonable to conclude

that the parties understood the conclusive effect of their stipulation in a future bankruptcy proceeding."). If the satisfactory intent is shown, the actual litigation component of issue preclusion is satisfied. *See In re Austin*, 138 B.R. 898, 908 n. 2 (Bankr.N.D.Ill.1992). The existence of clear intent that the consent judgment has conclusive effect likewise satisfies the requirement that the determination was essential to the final judgment. *Id.* (citing *In re Halpern*, 810 F.2d 1061, 1064 (11th Cir.1987)).

 In this matter, the subject issue is the application of the section 502(b)(6) cap to claims arising from the transaction. Unquestionably, Kmart was fully represented in the BONY Claim objection proceeding. Moreover, given the large number of lease claims asserted against the estate and the sophistication of Kmart and its counsel, clearly Kmart understood the import of the Agreed Order. For these same reasons, Kmart must have foreseen the significance of the Agreed Order's impact on future litigation with Claimants.

Finally, the language of the Agreed Order demonstrates and allows a reasonable conclusion that Kmart, BONY, and Claimants understood its conclusive effect. Specifically, they agreed that the claims "exclusively held" by BONY were the only claims arising from the transaction subject to the section 502(b)(6) cap and that the claims asserted by Claimants were distinct from the BONY Claims, not to be capped under section 502(b)(6). Consequently, the application of the cap was an essential part of the determination and allowance of the BONY Claims in the prior contested claim objection proceeding between Kmart and BONY.

For these reasons, the court concludes that the elements of issue preclusion have been established. Accordingly, Kmart is precluded from arguing that the section 502(b)(6) cap applies to the Claims.

## Application of Section 502(b)(6) to the Claims

 Even if Kmart was not precluded, the court would be hard pressed to apply the section 502(b)(6) cap to the Claims as a substantive matter. Section 502(b)(6) affects the determination of a lessor's claim for damages arising from termination of a lease. "Under the Bankruptcy Code, a landlord's claim for damages arising out of the termination of a lease is computed by determining the amount of damages provided for under applicable state law and applying the ceiling on that amount in accordance with section 502(b)(6) of the Code." L. Chekis & L. King, *Collier Real Estate Transactions and the Bankruptcy Code*, p. 3–110–1 (2006). The ceiling is applied, even if the debtor can afford to pay the noncapped claim. *In re Farley, Inc.*, 146 B.R. 739, 744 (Bankr.N.D.Ill. 1992).

The need for a section 502(b)(6) cap is apparent. Rejection claims are entitled to unsecured nonpriority status. Allowing a landlord's full claim for damages resulting from the termination of a long-term lease caused by rejection would swamp the unsecured creditor class and likely thwart reorganization efforts. On the other hand, a landlord is entitled to compensation. *See In re Gantos, Inc.*, 176 B.R. 793 (Bankr. W.D.Mich.1995); *In re Leslie Fay Companies, Inc.*, 166 B.R. 802 (Bankr.S.D.N.Y. 1994); *In re Goldblatt Bros., Inc.*, 66 B.R. 337 (Bankr.N.D.Ill.1986); *In re Smith*, 249 B.R. 328 (Bankr.S.D.Ga.2000). Section 502(b)(6) is a compromise between these two competing concerns. *In re Rose's Stores, Inc.*, 179 B.R. 789, 791 (Bankr.E.D.N.C.1995)(citing *In re Farley*, 146 B.R. 739, 744–45, (Bankr.N.D.Ill. 1992)).

The two predicates for triggering the use of section 502(b)(6) are (i) a claim of a lessor and (ii) damages resulting from termination of a real property lease. *In re Arden,* 176 F.3d 1226, 1229 (9th Cir.1999); *In re Interco, Inc.,* 137 B.R. 1003, 1005 (Bankr.E.D.Mo.1992); *Farley,* 146 B.R. at 745.

Courts have reached the general consensus that a lessor's claim against the estate of a bankrupt who is not the nominal lessee, but guarantor of the lease of non-bankrupt tenant, is subject to the cap. *See In re Lindsey,* 1997 WL 705435, *3 (4th Cir. Nov. 7, 1997). There is a modicum of case law involving an issue which is present here, however, whether a claimant who is not the nominal lessor nevertheless qualifies as a lessor for purposes of section 502(b)(6).

Kmart cites to one example of a court employing 506(b)(6) against a claim held by someone other than a lessor. *In re Southern Cinemas, Inc.,* 256 B.R. 520 (Bankr.M.D.Fla.2000). That case involved a movie theater lease with PBB ("PBB") as lessor to the original tenant, R.C. Cobb, Inc. ("Cobb"). Cobb assigned its interest in the lease to Kent Cinemas, Inc. ("Kent Cinemas"). The debtor, Southern Cinemas, Inc. ("Debtor") gave Cobb a guaranty of Kent Cinemas' lease obligations. Kent Cinemas later assigned its interests as tenant to the Debtor. When the Debtor filed its bankruptcy petition, it owed PBB over $29,000 in rent under the lease. The Debtor rejected the lease. PBB did not file a proof of claim, but the Debtor listed an uncontested, nonpriority unsecured claim in favor of PBB in its Schedules. As such, the landlord had an allowed claim that was paid under the Plan. *See* 11 U.S.C. § 1111(a).

Cobb filed a claim in excess of $1.8 million based on the guaranty. The Debtor objected arguing, *inter alia,* that the assignor's claim should be capped under section 502(b)(6). Cobb disagreed claiming it was not a lessor. The court observed that the "main crux" of the dispute in that case was "whether § 502(b)(6) applies to assignors of leases." The court looked to the legislative history of section 502(b)(6) noting that "[a]lthough the plain meaning of legislation ought to be conclusive, such a reading may be bypassed where the literal application of the statute will produce a result that conflicts with the intention of its drafters." *Id.* at 535 (citing *United States v. Ron Pair Enters.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). To the *Southern Cinemas* court, not capping the assignor's claim would violate the intention of section 502(b)(6) to "preserve a portion of the estate for unsecured creditors whose claims would otherwise be greatly diluted." *Id.* The rationale of section 502(b)(6) "is easily applicable to both lessors and assignors alike." *Id.* The court was also concerned with the potential for circumvention of section 502(b)(6) through crafty use of labels and invention of relationships that "limit the reach of § 502(b)(6)." In the end, the court considered the distinction between lessor and assignor to be "meaningless," and allowed the claim after application of the cap.

The matter here is distinguishable from *Southern Cinemas.* The assignor in that case stepped into the shoes of the lessor who initially held the lessor claims. As such, it was evident that the assignor was entitled to the lessor claims. To ignore that in favor of a literal reading of the statute would truly elevate form over substance.

A similar scenario happened here, but not in the way Kmart would have it. BONY is the entity here that became entitled to the lessor claims previously held by the Owner Trusts. BONY did not, howev-

er, argue that the BONY Claims were not subject to the cap. Had BONY done so, the *Southern Cinemas* reasoning would be persuasive.

Moreover, had Claimants, as beneficiaries of the Owner Trusts, asserted the BONY Claims, then Kmart would have a strong argument that Claimants were not the real party in interest entitled to the BONY Claims. In this matter, however, Claimants are not asserting the claims of the landlords under the Rejected Leases. Rather, the Claims asserted by Claimants arise from the Tax Indemnification Agreement and Participation Agreement. As noted previously, the court recognizes that the lost investment claim under the Participation Agreement has a tie to the rents in the sense that the investment was predicated, in part, on the expected rents. Nonetheless, the Claims are sufficiently distinct from the BONY Claims.

Kmart alternatively argues that even if Claimants are not the nominal lessors, they are the "true lessors." For the court to declare such it seems that at least one of two things must occur. Either the distinction between the Owner Trusts and Claimants should be ignored as in a veil-piercing context or the court must recharacterize the entire transaction from an economic substance argument. The court would not be inclined to do either.

 Even if the court was so inclined and declared Claimants to be the "true lessors," it is not evident that the Claims they assert are for damages resulting from the termination of the Rejected Leases. It cannot be said that "but for" the termination of the Rejected Leases, Kmart would have avoided liability under the Tax Indemnification Agreement or the General Indemnity. *See In re Atlantic Container Corp.*, 133 B.R. 980, 987 (Bankr.N.D.Ill. 1991) (section 502(b)(6) "is intended to limit only those damages which the lessor

would have avoided but for the lease termination" as opposed to damages relating to a breach of a lease covenant "separate and apart from the lease termination").

The tax indemnity portion of the Claims is related to the Leases in the sense that the Leases are one component in a transaction designed to provide tax deferrals. However, the Claims here do not arise directly from the Leases. Instead, the Claims are based on Claimants' desire to recover lost tax benefits from the transaction should an adverse tax consequence take place, which is not necessarily triggered by termination of the leases. (*See* Trans. Vol. II, p. 127). To limit such claims under section 502(b)(6) would "deviate from the real and reasonable expectations" of Claimants and Kmart. *See Atlantic Container*, 133 B.R. at 987.

Similarly, had the transaction run its course without termination of any of the Leases involved, Kmart could conceivably have been liable for a lost equity investment claim, provided that such a loss occurred and the claim was within the scope of the General Indemnity. Therefore, the General Indemnity component of the Claims is not a claim that would have been avoided "but for" a lease termination.

For these reasons, if Kmart was not precluded from raising the issue, the court would conclude that section 502(b)(6) does not apply to limit the Claims. The court will now determine the amount of the Claims, uncapped by section 502(b)(6).

**Determination of the Amount of the Claims**

Section 502(b) of the Code provides that when an objection to a claim is made, the court shall determine the amount of the claim and allow the claim in that amount, subject to certain exceptions that are not applicable here. 11 U.S.C. § 502(b). A claim arising from the rejection of an

unexpired lease is determined and allowed under section 502(b) "the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C. § 502(g).

 "Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000). The parties here agree that New York law governs the interpretation of the Participation Agreement and Tax Indemnification Agreement.

**The Tax Indemnity Portion of the Claims**

 Under New York law, "when a court adjudicates the rights of parties to the contract it is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote." *In re Enron Corp.,* 292 B.R. 752, 762 (Bankr.S.D.N.Y.2003)(*citations omitted*). If the contract is unambiguous, the court must enforce it according to its terms. *Id.* In construing a tax indemnity agreement in a leveraged lease transaction under New York law, a court noted that:

> The meaning of the language used must be found in the common sense and common speech of the average person, in the light of the reasonable expectation and purpose of the ordinary businessman. The subjective interpretation of the parties is of no moment when the words of the agreement, viewed in proper context, provide an unmistakable meaning.

*IBM Credit Financing Corp. v. Mazda Motor Mfg.(USA) Corp.,* 170 Misc.2d 15, 647 N.Y.S.2d 322, 327 (1996), *aff'd* 92 N.Y.2d 989, 684 N.Y.S.2d 162, 706 N.E.2d 1186 (1998)(quoting *Lewis v. Ocean Acc. &* *Guar. Corp.,* 224 N.Y. 18, 21, 120 N.E. 56 (1918); *Burr v. Commercial Travelers Mutual,* 295 N.Y. 294, 301, 67 N.E.2d 248 (1946)). Words of a contract "should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby." *Enron,* 292 B.R. at 763. Multiple agreements in the same transaction should be read together. *In re UAL Corp.,* 346 B.R. 783, 787 (Bankr.N.D.Ill.2006)(decided under New York law)(citing *Nau v. Vulcan Rail & Construction Co.,* 286 N.Y. 188, 36 N.E.2d 106, 110 (1941); *Flemington Nat. Bank & Trust Co. v. Domler Leasing Corp.,* 65 A.D.2d 29, 410 N.Y.S.2d 75, 77 (1978)).

 A liquidated damages provision in a contract is enforced unless it is found to operate as a penalty or forfeiture clause. *In re Ionosphere Clubs, Inc.,* 262 B.R. 604, 614 (Bankr.S.D.N.Y.2001)(*citations omitted*). The provision will be enforced if (i) the amount liquidated bears a reasonable proportion to the probable loss, and (ii) the amount of actual loss is incapable or difficult of precise estimation. *Truck Rent–A–Center v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977); *Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.,* 459 F.2d 896, 899 (2d Cir. 1972). To make the determination, the court considers the nature of the transaction and the amount of money involved from the parties' perspective at the time of contracting, not at the time of the breach. *Id.; The Edward Andrews Group, Inc. v. Addressing Services Co., Inc.,* 2005 WL 3215190, *6 (S.D.N.Y. Nov. 30, 2005)(*citations omitted*)("The party challenging the liquidated damages provision must proffer sufficient facts to demonstrate that at the time of contracting (1) prospective actual damages 'were readily ascertainable' or (2) damages agreed upon were 'conspicuously

disproportionate to ... foreseeable losses.' "). The court also considers whether the provision is a product of an arm's length transaction between sophisticated parties represented by counsel. *Id.*

 New York law recognizes and enforces formulaic liquidated damages clauses. *See BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1227 (1999); *Ionosphere,* 262 B.R. at 614 ("... courts uphold contractual provision fixing damages for breach when the terms constitute a reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach."). Mitigation of damages is irrelevant when a contract has an enforceable liquidated damages provision. *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.,* 271 A.D.2d 636, 706 N.Y.S.2d 724, 727 (N.Y.App.Div. 2000). If the liquidated damages clause is held unenforceable, the non-breaching party may still be entitled to actual damages. *See, e.g., Harrington v. Hasan,* 191 Misc.2d 617, 743 N.Y.S.2d 684, 687–88 (N.Y.Civ.Ct.2002).

The court concludes that clause (z) of section 3 of the Tax Indemnification Agreement is a formulaic liquidated damages clause. The clause was designed at the outset of the transaction to protect Claimants from adverse tax consequences caused by a variety of triggering events and as a means to settle the amount of Kmart's liability for those consequences. (Trans. Vol. II, pp. 13 and 15); (Trans. Vol. III, p. 272–74); (Trans. Vol. IV, p. 69).

The parties here agree that Kmart's liability under the liquidated damages clause was triggered by the Owner Trustees giving BONY deeds to the properties in lieu of foreclosures. Those deeds-in-lieu caused Claimants to incur an Income Inclusion, in the form of a realization of forgiveness of indebtedness income. As a result of the Income Inclusion, Claimants were liable for payment of income tax, which their agreement (and probably all taxpayers) define as an adverse consequence. Kmart agreed to indemnify Claimants for such adverse consequences.

 The triggering event, adverse consequence, and Kmart's liability have been established. All that remains is the determination of Kmart's liability. At the inception of the transaction, the parties agreed to two alternative methods for paying the tax indemnity amount; the lump-sum method of clause (z) involved here and the "pay-as-you-go" method of clause (y). The calculation under either method incorporates a number of assumptions and is quite complicated. *See generally Ionosphere,* 262 B.R. at 616 (in construing a formulaic liquidated tax indemnity clause, the court commented on the "numerous arguments of the parties" and "reams of papers filed") and Bruce E. Fritch, *Leveraged Leasing,* 347 PLI/Comm 408 (Practising Law Institute, Commercial Law and Practice Course Handbook Series, 1985)("Major provisions of all these leases-and inevitably the most complex and incomprehensible-is the tax indemnity section.").

Richard Mahoney, tax counsel for Altria Corporate Services, Inc. (a member of Claimants' corporate family), performed the calculation using the assumptions. (*See* Trans. Vol. II, p. 25, *et seq.*). For each of the rejected stores, Mahoney reduced the Amount Realized as a result of the deeds-in-lieu (which the IRS treats like sales of real property) by the Adjusted Tax Basis to arrive at the Taxable Gain. (*Id.,* p. 26). The controlling federal and state tax rates were then applied to the Taxable Gain amount. (*Id.,* p. 27). The resultant federal and state tax income amounts were increased by the "gross-up" amount in recognition of the fact that the

Tax Indemnification Agreement called for an indemnity on an "after-tax" basis. (*Id.*, pp. 29 and 31). In other words, the indemnity amount is taxable (at least the parties agree it is) and Kmart has to indemnify Claimants for that tax as well.

The income tax amounts plus the "gross-up" equals the amount of the total tax indemnity for each of the rejected stores. According to Claimants, adding up the figures for the ten stores results in a total tax indemnification claim equal to $21,080,373. Kmart argues that the calculation is incomplete. Kmart contends that certain tax savings Claimants enjoyed due to the early demise of the transaction must be reduced from the claim.

Kmart identifies three types of tax savings. First, Kmart argues that the present value of the taxes that Claimants would have had to pay on the income related to the Indentures had the transaction run its course must be reduced from the tax indemnity amount. (Trans. Vol. IV, pp. 105 and 107). Second, the amount should be further reduced by the benefit Claimants gained from the accelerated deductibility of the transaction expenses, ordinarily amortized over the life of the transaction, caused by the premature ending of the transaction. (*Id.*, p. 115). Finally, the indemnity amount should be reduced by the amount of deductions relating to the accrued but unpaid interest on the Indentures. (*Id.*, p. 117). The court will collectively refer to these three asserted reductions as the Tax Savings. Kmart posits that the total amount of the Tax Savings is $16,771,747. The total amount consists of $9,076,559 for the taxes Claimants did not have to pay (*Id.*, p. 113), $387,323 for the accelerated deductibility of the transaction expenses (*Id.*, p. 115), and $7,307,865 for the income tax deductions associated with the accrued but unpaid interest. (*Id.*, p. 119).

Kmart asserts that a further deduction of $600,000 is also in order. That reduction, according to Kmart, is the amount of income taxes Claimants have deferred by virtue of the Like–Kind Exchange. (*See* Trans. Vol. II, p. 107). Kmart characterizes the Like–Kind Exchange reduction as mitigation from the damage amount.

The court concludes that based on a reading of the entirety of clause (z), in the context of other terms of the Tax Indemnification Agreement and in light of the transaction as a whole, the claim under the Tax Indemnification Agreement should be reduced by the Tax Savings. Such reductions are not, contrary to the Claimants' argument, impermissible reductions from a liquidation clause. Rather, the reduction of the Tax Savings is a component of the clause.

The language of clause (z) itself provides for a reduction of tax savings. As expressed in that clause, when calculating the lump-sum amount, Claimants must "take into account any past, current and anticipated interest, penalties and additions to tax payable by the Owner Participant as a result of such Loss and any Federal, state or local net income tax benefits reasonably expected to be realized by the Owner Participant by reason of the circumstances or adjustments giving rise to the Loss." (Claimants' Ex. 2, p. 6). If the circumstances giving rise to the Loss are the deeds-in-lieu, which had the effect of cutting off the transaction before its anticipated end, then it would be reasonable to expect that not having to pay future taxes and the accelerated deductibility of the amortized expenses, would benefit Claimants. Indeed, the purpose of the tax indemnity is to compensate Claimants for adverse consequences "as if such Loss" had not occurred. If the Loss had not occurred, *i.e.*, if the deeds were not given to BONY, Claimants would have

paid taxes and would not have accelerated the expenses.

Moreover, subsection (c)(i) of section 3 of the Tax Indemnification Agreement (which applies to both clauses (y) and (z)) provides that "[i]f Kmart indemnifies the Owner Participant in full with respect to any Loss pursuant to this Section 3 and the Owner Participant shall realize with respect to any year Federal income tax savings that would not have been realized but for such Loss and which tax savings were not taken into account in calculating Kmart's indemnity payment to Owner Participant, then the Owner Participant shall pay to Kmart, on an After–Tax Basis, an amount equal to the sum of (i) such Federal income tax savings ..." (*Id.*, p. 9). In other words, if Kmart pays the indemnity amount as part of the Additional Rent through the course of the transaction under clause (y), Claimants are required to reimburse the amount of tax savings they enjoyed during the time they received the indemnity payments. This idea of adjusting the indemnity amount with the tax savings is not lost simply because Kmart pays the indemnity as a lump-sum under clause (z) as opposed to over time under clause (y).

Claimants' expert testified, however, that he has "not seen a concept in a tax indemnity computation whereby you would take the present value of the taxable income that you might have recognized if the deal continued and used that to reduce the indemnity amount." (Trans. Vol. III, pp.

329–330). This testimony of the purported industry view on the meaning of the tax indemnity language, is parol and might be acceptable explanatory evidence in construing a UCC contract. *See, e.g., In re Kmart*, 2005 WL 3132460, *6 (Bankr. N.D.Ill. Nov. 1, 2005). Here however, both parties insist the language of the agreement is unambiguous (Trans. Vol. I, p. 9) and the court sees no reason to hold otherwise.[20]

Claimants argue that the court should also keep in mind that because the properties were deeded to BONY, they will no longer be receiving the free cash from the transaction to pay future taxes. Consequently, the Owner Participant's Economics will not, contrary to Kmart's agreement to do so, be sufficiently preserved if the Tax Savings are reduced from the tax indemnity claim. (*See* Trans. Vol. II, pp. 74–77). This court agrees with Judge Wedoff's reasoning in the *UAL* case rejecting such an argument. In *UAL*, General Foods argued that as a result of the indenture trustee's foreclosure of aircraft precipitated by United's default, General Foods lost the free cash it expected to receive from the transaction. The loss of free cash meant that General Foods would lose the Net Economic Return (synonymous with "Owner Participant's Economics" in this matter (*see,* Trans. Vol. I, p. 103)) it bargained for and the loss was so great it exceeded the tax indemnity claim. General Foods argued that to protect the

**20.** The testimony of the idea of a reduction of the benefit in not having to pay taxes being completely foreign to the tax indemnity agreement also runs counter to published writings on this topic. *See* Ian Shrank & Arnold G. Gough, Jr., *Equipment Leasing–Leveraged Leasing*, § 4:6–1. Page 4–220 (4th ed.2003). ("The lump-sum indemnity takes a different approach: upon the occurrence of an indemnified event and the lessee's responsibility therefore, all of the tax consequences stemming from that event, negative and positive, are predicted and taken into account deriving a lump-sum amount that will keep the owner participant whole on a present value basis."); Bruce E. Fritch, *Leveraged Leasing*, 347 PLI/Comm 408 at 440–41 (Practising Law Institute, Commercial Law and Practice Course Handbook Series, 1985)("Of course, the indemnities should be off-set by any affirmative tax benefits the issue affords the lessor.").

Net Economic Return, the court should not reduce its tax indemnity claim by the tax savings it enjoyed from the early demise of the transaction. Judge Wedoff disagreed, finding that the reference to Net Economic Return cannot be read to increase the tax indemnity claim "beyond the *net* change in tax consequences." *UAL*, 346 B.R. at 788. Rather, the agreement is correctly read to mean that General Foods's right to receive Net Economic Return is capped at the net change, *i.e.,* "(A) additional taxes due to a 'Loss,' plus (B) resulting penalties and interest, less (C) tax savings." *Id.* The reasoning easily fits the circumstances here.

■ As noted, Kmart contends that the Tax Savings is $16,771,74, based on its expert Isaac Sperka's calculation. Claimants argue that Sperka's calculation is of no evidentiary value as he utterly failed to demonstrate the sources of the information from which the calculation was made. This court disagrees.

■ "Expert opinions are worthless without data and reasons." *Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 420 (7th Cir.1990). In order to avoid a finding that an opinion is utterly useless, the expert must include more than a bottom line conclusion. *Mid–State Fertilizer Co. v. Exchange Nat. Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989). The court must be made aware of the foundation comprised of the facts, sources of information and the inferential processes the expert utilized to arrive at the opinion. *Id.*

Here, Sperka did not just give a naked opinion of what he thought was the amount of the Tax Savings. In arriving at his opinion, Sperka and his colleague consulted Claimants' ABC Pricing Files (Trans. Vol. IV, pp. 28 and 107), which were admitted into evidence (Claimants' Ex. 117). The ABC Pricing Files contained information such as the depreciation applied to the

properties, the interest rates on the Indentures, the amount of third-party debt involved, and the equity and fees invested by Claimants. (Trans. Vol. I, pp. 129–130). Sperka also reviewed the tax returns and the damage model prepared by Claimants, which are also in evidence. (Trans. Vol. II, p. 73); (Trans. Vol. IV, pp. 28 and 107). Finally, he testified concerning the inferential processes he used in reaching his conclusion. (*See, e.g.,* Trans. Vol. IV, pp. 26–28 and p. 38).

Therefore, and given his established and unquestioned expertise in this area, the court finds Sperka's opinion useful and of sufficient weight. The court finds that $16,771,747 is the amount of the Tax Savings that must be reduced from the tax indemnity claim.

The court also notes that Claimants offered no alternative amounts for the Tax Savings. In addition, Claimants expressed no problems with Kmart's calculation of the Tax Savings. (Trans. Vol. II, p. 98, pp. 101–102 and p. 124). Finally, Claimants withdrew their objection made during the trial as to the lack of support for Sperka's calculations. (Trans. Vol. V, p. 3).

Sperka's testimony pertaining to the amount he placed on the deductions for the deferrals on the Like–Kind Exchange is perhaps not as weighty. The amount he places on that deduction is not clear. (*Compare* Trans. Vol. VI, p. 122 and p. 126). However, even if the testimony did not suffer from this incoherence, the court would not allow such a reduction to be made, as it is outside the meaning of the parties' agreement. The method of calculating the indemnity was arrived at prospectively and is based on assumed liability. As noted, the parties incorporated the concept of offsetting affirmative tax benefits from the indemnity amount. The amount of the taxes that Claimants would

have paid and the deductions they would have received by their nature lend themselves to being assumptions (*see* Trans. Vol. II, pp. 99–100 and 120–123) and indeed, they were. (Trans. Vol. IV, pp. 62–64). A subsequent transaction such as a like-kind exchange does not share this trait. (*See* Trans. Vol. III, p. 299). Rather, the like-kind exchange is more in the realm of the theoretical, dependent upon such occurrences as finding an owner who has property of comparable value he is willing to exchange and the ability to strictly comply with tax code regulations so as to satisfy the IRS. (Trans. Vol. II, pp. 56–58, and p. 64). It was correct for Kmart to characterize the Like–Kind Exchange separately from the Tax Savings. Reducing the indemnity amount by the Tax Savings is part of the agreement, reducing the indemnity by the effects of the Like–Kind Exchange is not.

Finally, the court notes that it is likely Kmart and its sophisticated counsel could have anticipated the possibility of a future like-kind exchange transaction and insisted on a credit from the tax indemnity amount should such an event occur. The absence of such a credit in the agreement is dispositive as to the parties' intent with respect to the same because "[c]ontingencies which could readily be anticipated but which were never mentioned can fairly be ignored as not within the contemplation of the parties." *IBM Credit Financing,* 647 N.Y.S.2d at 327.

Based on the foregoing, the court determines that the amount of the portion of the Claims based on the Tax Indemnification Agreement is $4,308,626.

### The General Indemnity Portion of the Claims

As noted, this portion of the Claims is based on Claimants' lost investment, and to a much lesser extent, stipulated reimbursement charges. The starting point for the calculation of the lost investment claim was Claimants' initial $21 million cash investment to fund twenty percent of the Purchase Price for the sixteen stores involved in the transaction. (Trans. Vol. III, pp. 191–207). A rate of return on that investment from the start of the transaction to the closing dates on the deeds-in-lieu was projected by Claimants to be 12.5%, the "Investment Return Realization Factor" (*Id.*), although that rate differed from the 14.6% rate of return actually used by the parties in formulating the transaction. (*Id.,* p. 205).

The amount of "free cash" Claimants received from the start date to the date of the deeds-in-lieu was calculated and deducted first from the anticipated rate of return, then from the principal amounts of the invested funds allocable to each property. The amount left over after these deductions is Claimants' lost investment claim, *i.e.,* $8,609,824. (*Id.,* p. 207).

■ Claimants contend that Kmart "indemnified" them for the $8.6 million loss pursuant to the broad language of the General Indemnity. To prevail on their argument, however, Claimants would have this court liberally construe the General Indemnity in isolation, divorced from the entire Participation Agreement and the context of the transaction in light of the reasonable expectations and purposes of the ordinary businessman.

■ Under New York law, the court must strictly construe an indemnity and cannot "read into it any obligations the parties never intended to assume." *Haynes v. Kleinewefers and Lembo Corp.,* 921 F.2d 453, 456 (2d Cir.1990) (citations omitted). Rather, the court must "carefully scrutinize the agreement[ ] for an expression of the unmistakable intent of the parties," which can be "clearly implied from the language and purposes of the

entire agreement." *Id.* (internal quotations and citations omitted). Here, the court has reviewed the language of the General Indemnity and strictly construing the same, the court cannot conclude that the General Indemnity evinces an unmistakable intention to indemnify Claimants from investment loss.

Rather, as Kmart notes the General Indemnity is "designed to assure that [Kmart], and not [Claimants], is responsible for the costs and risks associated with operating and owning the property." (Kmart's Memorandum, p. 36), *see also, Boise Joint Venture v. Moore,* 106 Or.App. 83, 806 P.2d 707, 710 (1991)(court, construing agreement under Idaho law, held that lease indemnity covered actions by third-parties, not claims to recover lost investment). This design to protect from third-party claims associated with operation of the properties is manifested through the choice of the words used in the General Indemnity. Kmart indemnifies Claimants *from and against* claims *incurred by, asserted against,* or *imposed on* Claimants. These phrases indicate an intent that Kmart protect Claimants from claims originating from outside sources (which is the typical reason for and purpose of an indemnity), not for claims between them. Kmart argues that to convert the General Indemnity into a guaranty of return on investment is "quite bizarre." Weirdness aside, given the language and context of the agreement, Claimants' interpretation is untenable.[21]

██ Moreover, even assuming the General Indemnity covered lost investment claims, the Carve–Out removes them from the General Indemnity. The Carve–Out contains language to the effect that Kmart does not guaranty that Claimants will recover any of the Residual Value or on the Notes. The term Residual Value was not a defined term in the documents. The accepted meaning of that term is the value of the properties at the end of the terms of the Leases. As discussed in *M & M Leasing Corp. v. Seattle First Nat. Bank,* there are instances when a lessee guarantees an amount of residual value, such as motor vehicle leases. 563 F.2d 1377, 1378 (9th Cir.1977). There are other transactions, involving so-called big-ticket items such as aircraft and ships, where such a guaranty is typically not given. *Id.* Here, Kmart did not guarantee any amount of Residual Value or the Notes.

The question is whether refusing to guarantee Residual Value and the Notes equates with refusing to promise a return on investment. Claimants urge that Residual Value is distinct from the equity investment, and therefore, the Carve–Out is inapplicable to a claim for lost equity. However, the amount of Claimants' investment was predicated on the projections of Residual Value and excess rents. Moreover, the lost investment portion of the Claims was calculated by reducing the investment and anticipated return by the excess rents received. From these two observations, it is clear that the claim for lost investment is at bottom one to recover the Residual Value and the Notes. As such, the lost investment claim falls squarely into the Carve–Out from the General Indemnity.

---

21. At least one Kmart executive did not think the Claimants' interpretation was "bizarre," when he observed in an interoffice memorandum that "... these documents do indeed say what the claimant argues-that Kmart did agree to indemnify [Claimants] and all Trusts and Trustees for economic losses of any kind." (Claimants' Ex. 120). His subjective view of the meaning of the documents, however, is irrelevant. *IBM Credit,* 647 N.Y.S.2d at 327.

The court concludes that Claimants are not contractually entitled to the lost investment portion of their claim under the Participation Agreement. The parties have stipulated to the allowance of the $428,998 claim for reimbursement of out-of-pocket expenses associated with the transaction. Therefore, the court determines that the amount of the Claims associated with the Participation Agreement is $428,998.

## CONCLUSION

Based on the foregoing, the court will enter a separate order determining that the amount of claim number 50863 is $4,737,624 and allowing the same as an unsecured nonpriority claim entitled to be treated as a Class 5 claim under the Plan.[22] The order will further provide for the disallowance of claims 50110, 50111, 50112, and 50113.

---

**22.** Claimants (in writing) and Kmart (orally) moved for directed judgment on partial findings under Fed.R.Civ.P. 52(c), made applicable herein by Fed. R. Bankr.P. 7052. Ruling on those motions was reserved until after the close of all of the evidence. The motions will be denied as there were no issues present in this matter upon which a ruling on partial findings would have been favorable to either party, so as to enable the court to enter judgment as a matter of law.